THE STATE OF KANSAS, *ex rel. Edward M. Bill*, v. JAMES H. ELTING, *et al.*

1. BRIBED VOTE, *Not Counted.* A vote which is cast by the voter upon any question, in consideration of money or property given to the voter personally, is void, and will never be counted.

2. CANDIDATE, *When Denied Office.* A candidate who gives or offers a voter any money or other property for his vote will be denied the office which in this way he is seeking to obtain. ( Comp. Laws 1879, p. 403, § 85, ¶ 4.)

3. BRIBERY; *Rule, When Enforced.* This rule will be enforced, (a) even though, without counting the vote bribed or sought to be bribed, the candidate has a clear majority of the votes cast; (b) or, though the bribery was indirectly attempted by an offer to discharge the duties of the office at less than the stated salary, and thus *pro tanto* to reduce the taxation upon each individual; (c) or, even though the bribery consists only in an offer to make a donation to some public purpose, and thus presenting to the voter other considerations than those of personal fitness for the office.

4. COUNTY SEAT; *Votes, When Not Vitiated.* But where the question is as to the location of a county seat, that question is one of convenience and material advantages; and where citizens of a town, contesting for such county seat, offer to donate money or other property to the county in case the county seat is located at such town, that offer presents no considerations which may not properly be considered by the electors, and vitiates no votes cast in pursuance of such offer.

## *Error from Rice District Court.*

WHEN the county of Ness was organized, in April, 1880, the town of Sidney was designated as the county seat. June 1, 1880, an election was held for the purpose of permanently locating the county seat, at which election four different places were candidates. After the election and the canvass of the votes cast thereat, Ness City was declared duly elected, and the county officers removed their offices to that place. This action was brought on the relation of *Edward M. Bill* against *James H. Elting* and all the other county officers, praying that a writ of mandamus be issued to each and all of the defendants, requiring and compelling them to remove their offices to Sidney, as the county seat; alleging fraud, cor-

ruption and bribery on the part of certain parties to procure the location of the county seat at Ness City, at and before the election. The cause was tried at the February Term, 1882. The court held the case under advisement from February 4 until September 20, 1882, when the peremptory writ of mandamus was denied, and judgment was rendered against the plaintiff for costs. The plaintiff brings the case here. The facts are stated in the opinion.

*Ansel R. Clark,* and *Nelson Adams,* for plaintiff in error.

*J. G. Mohler,* for defendants in error.

The opinion of the court was delivered by

BREWER, J.: This is a contest over a county-seat election. Passing by all the preliminary questions, we find these facts as stated by the court: The result of the election for the county seat of Ness county showed that Ness City received 390, Sidney 276, Waterport 50, and Clarinda 14 votes; apparently, therefore, Ness City received a clear majority of all the votes cast, and was by the county commissioners duly declared the county seat. It further appears from the findings of the court, that said Ness City was unincorporated at the time of said election; that the owners of the town site offered to the county of Ness every alternate undeeded lot in said town, containing and amounting to sixty-five acres of land, provided said county seat was located at Ness City; that certain parties, the owners of an addition to Ness City, offered ninety acres to the county upon the same conditions, and also that three of said owners of the town site executed a penal bond to seven electors named therein, in the sum of $250, for the conveyance to the county of fifty acres at and near Ness City, in case the said electors should vote for Ness City and it should become the county seat; that the value of this property thus offered to Ness county was $1,000; that some 135 legal voters of Ness county were influenced in whole or in part by these offers to vote for Ness City as the county seat,

and that had it not been for these offers Ness City would not have received a majority of the votes.

Notwithstanding these facts, the district court sustained the result of the election as declared by the commissioners, and now the plaintiff alleges error. That a purchased vote given for an individual candidate for office is not to be counted, is conceded. So also that a candidate for office who purchases a vote therefor is not to have the office, is also beyond question. Our statute respecting contesting elections provides as one of the grounds of contest, that "the contestee has given or offered any elector, or any judge, clerk or canvasser of the election, any bribe or reward, in money, property, or thing of value, for the purpose of procuring his election." (Comp. Laws 1879, p. 403, § 85, ¶ 4.) As a consequence of these rules it has been held, that a candidate for an office to which is attached a fixed salary, who offers to the electors to discharge, if elected, the duties of such office at less than the stated salary, is not entitled to have counted for him any votes given in consideration of such promise. (*State, ex rel., v. Purdy*, 36 Wis. 213; *State, ex rel., v. Collier*, 72 Mo. 13; *Carrothers v. Russell*, 53 Iowa, 350. See also *Nichols v. Mudgett*, 32 Vt. 546; *Cooke v. Shipman*, 24 Ill. 614; *Tucker v. Aiken*, 7 N. H. 113; *State, ex rel., v. Olin*, 23 Wis. 309.) In the case from 36 Wis., *supra*, the court, after referring to a number of authorities, uses this language:

"The doctrine which we think is established by the foregoing authorities, and which we believe to be sound in principle, is, that a vote given for a candidate for a public office in consideration of his promise, in case he shall be elected, to donate a sum of money or other valuable thing to a third party, whether such party be an individual, a county, or any other corporation, is void."

We have no doubt of the correctness of this doctrine; and in view of the fact that the great danger which now lies in the path of free institutions is the use of money in elections, the scope of this healthful doctrine should in no manner be limited or abridged by the courts. The purity of the

*(Margin notes: 1. Bribed vote, not counted. 2. Candidate, when denied office.)*

ballot-box should be insisted upon at all times and in all places. Only in that way can be upheld and maintained the integrity, and therefore the permanence, of popular government. Counsel for plaintiff in error invoke the application of this doctrine, and insist that it is controlling in this case and compels a reversal of the judgment of the district court. Counsel for the defendants in error insists that there is a marked distinction between the cases cited and the one at bar; that no authority can be found vitiating an election like this; and that it would be a gross interference with the freedom of the electors to deny them the result of this election. He refers to the case cited by the other side from 36 Wis., and calls attention to the following language of the court, drawing a distinction between that case and one like the present:

"Reference should be made to the cases which have sustained the validity of bids or pecuniary offers to secure the location of public buildings at some particular place. We have no controversy with these cases here. The distinction between the election of public officers, to whom for the time being the exercise of the functions of sovereignty is intrusted, and the mere choice of a site for a public building, is quite apparent. The former involves, or may involve, the integrity of the government and the preservation of the principles upon which it is founded; while the latter is only a matter of public convenience or pecuniary interest, involving no fundamental principles whatever."

It becomes necessary to analyze the principles which underlie the decisions cited, in order to ascertain how far they are applicable here. When a candidate gives an elector personally money or property, there is a direct attempt to influence his vote by pecuniary considerations. The expectation is that such vote will be controlled, not by the elector's judgment of the fitness of the candidate for the office, but by the pecuniary benefit he has received. In other words, it is money and not judgment which directs the ballot; and so the election turns not on considerations of fitness or public good, but of private gain. Let such be tolerated, and elections will be simply the measure of the size of the candidates'

purses.    In the closing and degenerate days of Rome's
august empire, preceding its immediate downfall, the im-
perial purple was sold at public auction to the highest bid-
der.    Equally base and equally significant of present decay
and impending downfall would be the toleration of the pri-
vate purchase of electoral votes.    That which is wrong when
done directly, is equally wrong when done indirectly.    Sal-
aries are paid by taxation, and when a candidate offers to
take less than the stated salary, he offers to reduce *pro tanto*
the amount of taxes which each individual must pay.    If
the candidate went to each elector and offered to pay one dol-
lar of his taxes, that clearly would be direct bribery; and
when he offers to take such a salary as will reduce the tax
upon each tax-payer one dollar, he is indirectly making the
same offer of pecuniary gain to the voter; so that those
cases rest upon the simple proposition that the election of a
candidate for office cannot be secured by personal bribery
offered directly or indirectly to the voter.    A notable case il-
lustrating this principle took place in Massachusetts in 1810.
At that time each town was required to pay the expenses of
its own representatives in the general assembly.    The town of
Gloucester was entitled to six members, but for economical
considerations the town had been in the habit of sending
only two.    For political reasons, that year it was thought
best to send the full delegation, and with a view to induce
the town to do this, certain citizens gave a bond, conditioned
that the expense of the full delegation should not exceed to
the town the pay of two members; and thereupon a full dele-
gation was elected.    Although the members elected had no
agency in procuring such bond, the house of representatives,
by a vote of 224 to 125, declared the election void, and the
seats of the entire delegation vacated. (Reports of Contro-
verted Election Cases, by Cushing, Story, and Josslyn, 97.)

A further question may arise when the offer of the candi-
date carries with it no pecuniary benefit to the voter.    As,
for instance, should a candidate for a county office offer to

26 — 29 KAS.

<span style="margin-note">3. Bribery; rule, when enforced.</span>

give if elected a portion of his salary for the erection of a public fountain; or, if a candidate for a state office should offer if elected to endow a chair in some college: here it may be said that the voter is in no way influenced by considerations of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation. This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason: wrong considerations are thrown into the scale to influence the vote of the elector. The theory of popular government is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions—is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power of personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is in spirit at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter.

Do these considerations apply to the case at bar? We think not, and for these reasons: There is no question of moral character or personal fitness involved: the question is really and solely one of convenience and material advantages.

<span style="margin-note">4. County seat; votes, when not vitiated.</span>

A state capital or a county seat is selected because of the supposed material advantages it offers for the transaction of public business. Among these are centrality of location, convenience of access, the number and condition of the roads leading to and from it, the halls, office rooms, hotels, and other conveniences which it may have for the accommodation of those having occasion to visit such capital or county seat, and for the transaction of public business there. It is therefore primarily, if not solely,

a question of material advantages, and an offer by a munici-
pality or any of its citizens to increase those advantages in-
troduces no foreign or improper matter to the consideration
of the voter. If of two towns, candidates for the county seat,
the one has good roads, bridges, and other means of access
from all parts of the county, and the other has not, every
voter in casting his ballot considers, and has a right to con-
sider and be influenced by such superior and material advan-
tages; and if neither place is so fortunate in this respect, and
the citizens of either proffer to furnish such conveniences,
such proffer presents a consideration which may fairly be
weighed by the voter. Therefore his thought is not turned
away from the true question before him: such considerations
enter into and form a part of the fitness of the place. The
choice of a county seat is like the location of a railroad—a
purely business question, and determined by the material ad-
vantages offered. As it is no offense against morals or public
policy for the citizens of a place to offer material inducements
for the location of a railroad, neither is it for them to offer
inducements for the location of a county seat. The history
of every state is full of instances in which the location of a
county seat, a capital, or a public institution, has been secured
by the offer of material inducements, and no case have we
been able to find in which such location has thereby been de-
clared void. In the contest over our own state capital, it is
a well-known fact that the city of Topeka offered to donate
the present state-house grounds, if the capital were located
here. Doubtless that offer influenced many votes, yet no one
for a moment supposed that the election was thereby inval-
idated. The legislature of 1863 attached as a condition to
the location of the normal school at Emporia, a provision
that a tract of twenty acres, adjacent to the town site, should
be donated and secured to the state. The Osborne City com-
pany built a court house, and donated it, with the block on
which it stood, to Osborne county, on condition that the
county seat should be located at Osborne City. (*Yoxall v.
Comm'rs*, 20 Kas. 581.) And within the knowledge of us all,

many similar instances have occurred in the history of this state. It is true that the frequency with which an act is done does not establish its moral character, or prove that it is right. But still. the fact that it has occurred so often and has been hitherto unchallenged, especially when there is so much feeling as there is in county-seat election cases, is some evidence tending to show that in the general judgment there is nothing immoral or improper in such act. So far as authorities can be found, they sustain the foregoing conclusions. The case of *Dishon v. Smith*, 10 Iowa, 212, is directly in point. There the citizens of the town of Marshall, a contestant for the county seat, offered to pay $500 for the building of bridges across the Iowa river, upon the express condition that the citizens of Marion township would vote for Marshall as the county seat; they also offered certain real estate in the town of Marshall to the county, upon the condition that the people should locate the county seat at said town. And it was held that such acts were not bribery, and did not invalidate the election. In discussing the question, the court uses this language:

"We do not think the giving facilities for the public convenience to the whole county, such as furnishing a building for the courts and offices, and thus relieving the county from a burden of expense, amounts to bribery. Nor would the giving property, though not of that specific character, but yet adapted to reducing the expense of a change. If the people of a town desire a county seat located at such place, there is no wrong and no corruption in their offering and giving facilities to produce that result. Either in buildings and offices direct for the use of the public, or in property or money to produce the facilities, they may offer to take away or to lessen the pecuniary burden which would come upon that public, the county, by the location, or by a change of location. And this cannot be bribery. And it may be doubted whether such an act can become bribery when the offer is to the whole county, and upon a matter of county interest only."

The recent case of *Hall v. Marshall*, Kentucky court of appeals, December 16, 1882, 2 Ky. L. J. 518, is also directly in point. In *State, ex rel., v. Supervisors*, 24 Wis. 49, it was

held, that the legislature could lawfully provide that after a majority of votes had been cast in favor of the removal of a county seat to a certain city, it should not be removed to such city until it had placed at the control of the county supervisors a specified sum of money. See also *Commissioners v. Hunt*, 5 Ohio St. 448; *Newton v. Comm'rs*, 26 Ohio St. 618; same case, 100 U. S. 548; *Twiford v. Alamakee County*, 4 G. Greene, 60; *People v. St: Claire County*, 15 Mich. 85; *Attorney General v. Supervisors*, 33 Mich. 289; *County v. Patterson*, 56 Ill. 111; *Gilmore v. Haworth*, 56 Tex. 89; *Calaveras County v. Brockway*, 30 Cal. 325; *Alley v. Denson*, 8 Tex. 197; *Adams v. Logan County*, 11 Ill. 337; *Armstrong, et al., v. Com.*, 4 Blackf. 208. Our own statute seems also impliedly to recognize such a transaction, (Comp. Laws 1879, p. 313, ch. 26, §2,) for it speaks of the donation of county buildings, which common experience shows is seldom made except as a condition of securing a county seat.

We think, therefore, in conclusion, that while the court should be careful not to sanction anything that looks like bribery, or which will interfere with the purity of elections, it cannot be adjudged in this case that the acts complained of were such as would vitiate the election, or deny to the electors the county seat which they have chosen. The judgment of the district court will therefore be affirmed.

All the Justices concurring.