TIPTON, Appellant, *v.* SANDS, Respondent.

(No. 7,520.)
(Submitted April 30, 1936.   Decided July 13, 1936.)
[60 Pac. (2d) 662.]

*Mr. Edmond G. Toomey* and *Mr. John W. Chapman,* for Appellant, submitted a brief and argued the cause orally.

*Mr. B. K. Wheeler, Mr. James E. Murray, Mr. Joseph P. Monahan, Mr. A. G. Shone, Mr. H. L. Maury, Mr. T. F. Nolan,*

4

*Mr. Harry L. Burns, Mr. D. C. Kenyon, Mr. Wellington D. Rankin, Mr. Arthur P. Acher, Mr. C. A. Spaulding, Mr. Frank T. Hooks,* and *Mr. George E. Hurd,* for Respondent, submitted a brief; *Mr. Hurd, Mr. Shone* and *Mr. Rankin* argued the cause orally.

HONORABLE W. L. FORD, District Judge, sitting in place of MR. JUSTICE MATTHEWS, disqualified, delivered the opinion of the court.

This is an election contest. Contestant has appealed from a judgment of the lower court favorable to the contestee.

In his petition the contestant alleges: That a general election was held in the state of Montana on the 6th day of November, 1934, for the election, among other state officers, of a Chief Justice of the supreme court of the state of Montana; that Llewellyn L. Callaway and Walter B. Sands were candidates at said election for such office, and that the board of canvassers returned the said Walter B. Sands as being duly elected at said election for the office of Chief-Justice of the supreme court of the state of Montana; that, with the intent and purpose to induce the voters and electors to vote for him for the office of Chief Justice of the supreme court of the state of Montana, the said Walter B. Sands at various times and places in the state, prior to said election, generally and publicly announced, declared and promised that, if elected, he would serve as Chief Justice of the supreme court of the state of Montana at a salary of $6,000 per year, and would not receive or accept the salary of $7,500; that by said announcements, declarations and promises by him made, the said Walter B. Sands gave or promised to give a valuable consideration to the said electors, with the intent and purpose to induce them to vote for him as a candidate for the office of Chief Justice of the supreme court of the state of Montana at said general election; that with the intent and purpose to induce the said voters to vote for him for the office of Chief Justice of the supreme court of the state of Montana, the said Walter B. Sands published and cir-

culated campaign cards, placards and advertising matter in words and figures as follows:

"W. B. Sands.

"Candidate on the Democratic Ticket for Chief Justice.

"Experience before the U. S. Supreme Court, International Joint Commission, Law Appeal Board of Interior Dept., and all courts of Minnesota and Montana. Graduate of Minnesota University Law School.

"From the Constitution of Montana, Art. VIII, sec. 30:

" 'No justice of the supreme court or judge of the District Court shall accept or receive any compensation, fee, allowance, mileage, perquisite or emolument for or on account of his office, *in any form whatever, except the salary provided by law.*'

"The salary provided by law is $6,000.00. Each of the five Judges of the Supreme Court now collect an additional salary of $1,500.00 a year for 'reporting their decisions' (writing the headlines). The court stenographer gets $4,000.00 a year for doing this work. The extra salary is unearned and unconstitutional. If elected I will accept no more than the constitutional salary.

"Economy in state finances should begin at the top. The vote in the state for me will express the trend of public opinion to the next legislature."

That at various places in the state Walter B. Sands addressed assemblies of electors, spoke over a radio station at Great Falls, and discussed with electors personally the matters set forth in the printed cards; that all such announcements, declarations and promises were made with the intent and purpose of respondent to induce the electors to vote for him for Chief Justice, and thereby respondent gave or offered to give a valuable consideration to the electors for their votes, and that such announcements, declarations and utterances constituted undue influence upon the electorate, resulting in deliberate, serious and material violation of the Corrupt Practices Act of this state. (Rev. Codes 1921, secs. 10773 et seq.)

Contestee in his answer admitted the publication and circulation of the card set forth, the addresses to and discussions with electors as alleged in the petition, and denied the other allegations of the petition; averred that in good faith he believed, and so stated, that in his opinion the law purporting to authorize the payment of $1,500 annually to each of the Justices of the supreme court for reporting their decisions was unconstitutional, and that the Chief Justice was entitled to only $6,000 per annum, and that he would accept only the salary authorized by the Constitution and law of the state; and that his oral and printed statements were his declaration of the principles in which he believed and for which he stood and which he would endeavor to have established in this state, and were made for no other purpose than to inform the electors thereof.

In his reply the contestant denied the good faith of the contestee in making such announcements and declarations, and alleged that they were made corruptly to influence the electors to vote for him.

The only witness on behalf of the contestant was Walter B. Sands, who testified that he made the statements and declarations above, and published and circulated the cards as alleged; that he visited fifty-two counties of the state and distributed his cards and interviewed voters, and that he made said declarations and statements and distributed said cards with the intent to influence electors to vote for him; that he had the general proposition that the $1,500 paid to the Justices for reporting decisions was unearned, and in view of all the circumstances it was too much at that time; that more than ten years prior to his becoming a candidate for Chief Justice he investigated the question of the constitutionality of section 378, Revised Codes of 1921, which provides for a salary for each of the Justices for reporting cases, and his mind was thoroughly made up that the law was unconstitutional; that when he filed his petition for nomination, he inclosed only $60, which was returned to him by the Secretary of State, who stated in his letter returning the same that the filing fee was

$75; that witness requested the Secretary of State to secure an opinion from the Attorney General, which the secretary did, and on the 17th day of May, 1934, inclosed the Attorney General's opinion to him, holding the filing fee to be $75, and the Secretary of State wrote him it would be necessary to test the matter out by a writ of mandate or some other proceeding; that thereupon he paid the filing fee of $75, $15 of which was paid under protest; that he never instituted any action to test the constitutionality of section 378, nor did he ever commence any action to recover the $15 paid under protest.

On his own behalf the witness testified that when he made the statements and declarations and circulated the cards, he thought that the Constitution and the law authorized not over $6,000, and that he acted in good faith; that he discussed the matter with several lawyers of the state who were of the same opinion and so stated to him; several lawyers testified in the case to that effect.

The court made findings of fact and conclusions of law and entered judgment dismissing the petition, in which the court found: "That all campaign cards, placards, advertising matter, addresses by radio or from platforms to audiences in the state, and all announcements, statements and declarations, including conversations with electors, relating to the amount of salary to which he would be entitled if elected as Chief Justice of the supreme court of the state of Montana, were based upon his opinion that the law of Montana did not warrant or justify the payment of any salary to any Judge of the supreme court in excess of the sum of Six Thousand ($6,000.00) Dollars, and that all of said statements were believed by said contestee, and all of them were made for the purpose of informing the electors who would vote at the general election held on November 6, 1934, of the principles for which he stood and which he believed, and to which, if elected to the office of Chief Justice, he would adhere."

Numerous assignments of error are made by the appellant in his brief, and several assignments are made by the respondent; but they have grouped them under the following heads:

I. Did the trial court have jurisdiction to entertain, and contestant to maintain, the action.

(a) Under the Constitution and statutes?

(b) Under the petition as laid?

II. Did the contestee's answer set forth any valid defense to the action?

III. If so, does the evidence furnish any support for the findings of fact, conclusions of law and judgment of the trial court?

IV. Did the announcements, statements and declarations constitute the giving, or offering to give, a valuable consideration to the electors to vote for Walter B. Sands?

V. That under the circumstances herein it would not be unjust for the trial court to deprive the said Walter B. Sands of his office.

The provisions of the Corrupt Practices Act applicable to the issues in this case are as follows: .

"Any person shall be guilty of a corrupt practice, within the meaning of this Act * * * if he is guilty of * * * the giving or promising to give, or offer of any money or valuable thing to any elector, with intent to induce such elector to vote for or to refrain from voting for any candidate for public office * * * at any election." (Sec. 10796, Rev. Codes 1921.)

"Where, upon the trial of any action or proceeding under the provisions of this Act * * * to remove a person from his office, it appears from the evidence that the * * * offenses complained of were trivial, unimportant, and limited in character, * * * or that any act or omission of the candidate arose from inadvertence or from accidental miscalculation, or from some other reasonable cause of a like nature, and in any case did not arise from any want of good faith, and under the circumstances it seems to the court to be unjust that the said candidate shall forfeit * * * his * * * office, or be deprived of any office of which he is the incumbent, then the * * * election of such candidate shall not by reason

of such offense or omission complained of be void, nor shall the candidate be removed from or deprived of his office." (Sec. 10803, Id.)

"If, upon the trial of any action or proceeding under the provisions of this Act, for the contesting of the right of any person declared to be * * * elected to an office, or to annul and set aside such election, or to remove any person from his office, it shall appear that such person was guilty of any corrupt practice, illegal act, or undue influence, in or about such * * * election, he shall be punished by being deprived of the * * * office, * * * and the vacancy therein shall be filled in the manner provided by law. The only exception to this judgment shall be that provided in the preceding section of this Act." (Sec. 10804, Id.)

The appellant in his brief has discussed the constitutionality of the above statutes in several particulars, but inasmuch as the respondent does not attack the same as unconstitutional, save and except in two particulars, we will dispose of these only.

It is contended by the respondent that the provisions of the ▓ Corrupt Practices Act purporting to authorize the removal of a state officer by a proceeding of this kind is in contravention of Article V, section 17, of the Constitution of the state of Montana, which provides: "The governor, and other state and judicial officers, except justices of the peace, shall be liable to impeachment for high crimes and misdemeanors, or malfeasance in office, but judgment in such cases shall only extend to removal from office and disqualification to hold any office of honor, trust or profit under the laws of the state," etc. It will be observed that the above provision applies to the removal of the officers indicated therein for high crimes and misdemeanors, or malfeasance *in office,* while the proceeding involved herein is to determine the validity of contestee's election; if he is guilty of a corrupt practice his election is void and he holds no office and never did. (*State ex rel. La Follette* v. *Kohler*, 200 Wis. 518, 558, 228 N. W. 895, 69 A. L. R.

348; *State* v. *Towns,* 153 Mo. 91, 54 S. W. 552; *Ashley* v. *Three Justices of Superior Court,* 228 Mass. 63, 116 N. E. 961, 964, 8 A. L. R. 1463; note in Ann. Cas. 1916B, 709.) Numerous cases are cited by respondent, but in all of them the legislature attempted to provide a method for the removal of a state officer, other than by impeachment, for *misconduct in office,* and the validity of the election and title to the office were not involved. Section 9, Article IX of the Constitution gives the Legislative Assembly power to pass such laws as may be necessary to secure the purity of elections and guard against abuses of the elective franchise.

The respondent further contends that provisions of the Corrupt Practices Act, in so far as they are involved in this case, are in contravention of section 10 of Article III of the state Constitution, which provides: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write, or publish whatever he will on any subject, being responsible for all abuse of that liberty." This provision of our Constitution was not intended to extend immunity for every use or abuse of language. (*State* v. *Kahn,* 56 Mont. 108, 182 Pac. 107, and cases therein cited; *State* v. *Smith,* 57 Mont. 563, 190 Pac. 107; *Frohwerk* v. *United States,* 249 U. S. 204, 63 L. Ed. 561, 39 Sup. Ct. 249, 250.) "The one fundamental idea conveyed by this section [of the Constitution] is penalty for a a violation of the privilege, not prevention of its abuse." (*Lindsay & Co., Ltd.,* v. *Montana Federation of Labor,* 37 Mont. 264, 96 Pac. 127, 131, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707.) As was said by Mr. Justice Holmes in the case of *Frohwerk* v. *United States,* supra: "We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later, ever supposed that to make criminal the counseling of a murder within the jurisdiction of Congress would be an unconstitutional interference with free speech."

While neither appellant nor respondent have cited any case directly in point, we hold that so far as applicable to this case and the charge of the violation of the Corrupt Practices Act

contained in the petition, the Act is not in contravention of the above provision of our Constitution. There is nothing in the Act that prevents a person from discussing his principles during a campaign.

Therefore, the trial court had jurisdiction to entertain, and contestant to maintain, the action under the Constitution and statutes, and under the petition as laid, if such petition states a cause of action. In this respect we encounter the question, Did the announcements, statements and declarations constitute the giving or promising to give or offer any valuable thing to the electors to vote for Walter B. Sands, and refrain from voting for his opponent?

An unbroken line of decisions has held that offers made and ▮ statements published by candidates for a public office that they will, if elected, serve at less salaries or for less fees than those fixed by law, are in violation of Corrupt Practices Acts, such as the one contained in our statute, and constitute bribery under the common law. (*Wells* v. *Taylor*, 5 Mont. 202, 3 Pac. 255; *State* v. *Purdy*, 36 Wis. 213, 17 Am. Rep. 485; *Prentiss* v. *Dittmer*, 93 Ohio St. 314, 112 N. E. 1021, L. R. A. 1917B, 191; *State* v. *Elting*, 29 Kan. 397; *Carrothers* v. *Russell*, 53 Iowa, 346, 5 N. W. 499, 36 Am. Rep. 222; *Kundert* v. *City of Madison*, 39 S. D. 43, 162 N. W. 898; *State* v. *Collier*, 72 Mo. 13, 37 Am. Rep. 417; *Diehl* v. *Totten*, 32 N. D. 131, 155 N. W. 74, Ann. Cas. 1918A, 884; *State* v. *Bunnell*, 131 Wis. 198, 110 N. W. 177, 11 Ann. Cas. 560; *Fields* v. *Nicholson*, 197 Ind. 161, 150 N. E. 53.) The underlying principle of all these decisions is that when a candidate offers to discharge the duties of an elective office for less than the salary fixed by law, a salary which must be paid by taxation, he offers to reduce *pro tanto* the amount of taxes each individual taxpayer must pay, and thus indirectly makes an offer to the voter of pecuniary gain. The offer, in effect, is an offer of money for the elector's vote.

In *State* v. *Elting*, supra, the supreme court of Kansas, speaking through Mr. Justice Brewer, later a Justice of the

United States Supreme Court, affords such a clear and convincing discussion of the evils sought to be prevented by the statutes and laws enacted on the purity of elections, that we quote the opinion at length. It is as follows:

"When a candidate gives an elector personally money or property, there is a direct attempt to influence his vote by pecuniary considerations. The expectation is that such vote will be controlled, not by the elector's judgment of the fitness of the candidate for the office, but by the pecuniary benefit he has received. In other words, it is money and not judgment which directs the ballot; and so the election turns not on considerations of fitness or public good, but of private gain. Let such be tolerated, and elections will be simply the measure of the size of the candidates' purses. In the closing and degenerate days of Rome's august empire, preceding its immediate downfall, the imperial purple was sold at public auction to the highest bidder. Equally base and equally significant of present decay and impending downfall would be the toleration of the private purchase of electoral votes. That which was wrong when done directly is equally wrong when done indirectly. Salaries are paid by taxation, and when a candidate offers to take less than the stated salary, he offers to reduce *pro tanto* the amount of taxes which each individual must pay. If the candidate went to each elector and offered to pay one dollar of his taxes, that clearly would be direct bribery; and when he offers to take such a salary as will reduce the tax upon each taxpayer one dollar, he is indirectly making the same offer of pecuniary gain to the voter; so that those cases rest upon the simple proposition that the election of a candidate for office cannot be secured by personal bribery offered directly or indirectly to the voter. * * *

"A further question may arise when the offer of the candidate carries with it no pecuniary benefit to the voter. As, for instance, should a candidate for a county office offer to give, if elected, a portion of his salary for the erection of a public fountain; or if a candidate for a state office should offer if elected to endow a chair in some college—here it may be

said that the voter is in no way influenced by consideration of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation. This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason: wrong considerations are thrown into the scale to influence the vote of the elector. The theory of popular government is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions —is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power of personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is, in spirit at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter.''

None of the authorities cited by the respondent upon this question are applicable. The case of *Owsley* v. *Hill*, 210 Ky. 285, 275 S. W. 797, involved a promise made by a candidate to serve for a less salary than had theretofore been paid, such salary to be fixed by the commissioners, and the salary had not been so fixed.

We therefore hold that the petition states a cause of action, unless section 378 of the Revised Codes of 1921 has been repealed or is unconstitutional.

Inasmuch as the respondent Sands did not advocate in his statements and declarations that said section had been repealed, we do not deem it necessary to discuss the question at length. Section 378 was originally Senate Bill No. 30, enacted by the Legislative Assembly of 1899 (page 72), which Act abolished the office of reporter of the supreme court and transferred all of the duties of the reporter to the members of the court,

making direct reference to the duties prescribed in sections 891 to 897 of the Political Code of 1895 of the state of Montana, and then provided that the salary of the Justices for performing these duties shall be $1,500 per year. The salary of the Justices was originally $4,000; thereafter, in 1905 (Laws 1905, Chap. 43), the salary was by an amendment to section 860 of the Political Code increased to $6,000, and contained the provision that "all Acts and parts of Acts in conflict herewith are hereby repealed." There is no Act of the Legislative Assembly expressly repealing section 378, and respondent contends that the above Act increasing the salary of the justices repeals section 378 by implication.

Repeal of a statute by implication is not favored by the courts. (*State ex rel. Metcalf* v. *Wileman,* 49 Mont. 436, 143 Pac. 565; *Penwell* v. *Board of County Commissioners,* 23 Mont. 351, 59 Pac. 167; *State ex rel. Hay* v. *Hindson,* 40 Mont. 353, 106 Pac. 362; *State ex rel. Wynne* v. *Quinn,* 40 Mont. 472, 107 Pac. 506; *Box* v. *Duncan,* 98 Mont. 216, 38 Pac. (2d) 986.) To make tenable the claim that an earlier statute was repealed by a later one, the two Acts must be plainly and irreconcilably repugnant to, or in conflict with, each other; must relate to the same subject; and must have the same object in view. (*Jobb* v. *Meagher County,* 20 Mont. 424, 51 Pac. 1034; *State ex rel. Esgar* v. *District Court,* 56 Mont. 464, 185 Pac. 157; *Equitable Life Assur. Co.* v. *Hart,* 55 Mont. 76, 173 Pac. 1062; *Box* v. *Duncan,* supra.) We can find nothing in either Act which conflicts with any provision of the other, and as repeal by implication is a matter of intention of the Legislative Assembly, the fact that the same Legislative Assembly which passed the Act increasing the supreme court Justices' salary, appropriated money for the payment of both the salaries provided by section 860 of the Political Code as amended, and that provided by section 378, Senate Bill 30 of the Laws of 1899, would indicate that it did not intend to repeal the latter Act. We, therefore, hold that section 378 was not repealed.

Respondent contends that section 378 is in contravention of the provisions of section 30, Article VIII of the Constitution of the state of Montana, which reads as follows: "No justice of the supreme court * * * shall accept or receive any compensation, fee, allowance, mileage, perquisite or emolument for or on account of his office, in any form whatever, except the salary provided by law," and in so contending urges that when the Justices accept the fifteen hundred ($1,500) Dollars provided by section 378, they accept same "for or on account of his office"; that they perform the duty in reporting the supreme court decisions only "for or on account of" the fact that they are Justices of the supreme court; that the salary for the performance of their duties as supreme court Justices is fixed at the sum of $6,000; and that they could not under the Constitution receive the $1,500 provided by section 378 for the duties therein enumerated, and cites the case of *Burns* v. *Board of Commissioners of Deuel County*, 39 S. D. 426, 164 N. W. 1028, which is a well-reasoned case holding, under a similar constitutional provision, that a county judge could not, in addition to his salary, receive and retain for his own use fees for services while acting as a member of the board of commissioners of insanity. However, section 29 of Article VIII of the Constitution of the state of Montana permits the legislature to change the salary, and we are of the opinion that the Legislative Assembly, by enacting Senate Bill No. 30 in 1899, clearly intended to increase the salary of the supreme court Justices, and for some reason unknown to us took that method of doing so. The Act merely abolished the office of court reporter and transferred all of the duties to the members of the court, and as the Constitution does not prohibit such method of increasing the salary of the Justices, and while the duties the Justices perform in reporting the decisions are performed for or on account of their offices, the salary of $1,500 provided by section 378 is a salary "provided by law."

The respondent further contends that section 378 is in contravention of the provisions of section 35, Article VIII, of the Constitution of the state of Montana, which reads as fol-

lows: "No justice of the supreme court shall * * * hold any other public office while he remains in the office to which he has been elected or appointed." This section is not violated unless section 378 creates five separate offices of reporter, and thereby gives to each Justice an additional official capacity, which it is clear the legislature did not attempt to do, as it abolished the office of supreme court reporter, and transferred all duties of reporting decisions to the Justices. Furthermore, supreme court reporter is not an office within the meaning of section 35, Article VIII, above, as it lacks one of the elements of a public office, as defined by this court in the cases of *State ex rel. Barney* v. *Hawkins,* 79 Mont. 506, 257 Pac. 411, 53 A. L. R. 583, and *State ex rel. Nagle* v. *Page,* 98 Mont. 14, 37 Pac. (2d) 575, in this: That the position does not possess a delegation of a portion of the sovereign power of the government, to be exercised for the benefit of the public. (*Robertson* v. *Ellis County,* 38 Tex. Civ. App. 146, 84 S. W. 1097; *State ex rel. Nagle* v. *Page,* supra.)

While we entertain some doubt as to the constitutionality of ▪ section 378, in considering the question we must bear in mind the canon of statutory construction which requires the indulgence of every presumption in favor of the constitutionality of an Act of the Legislative Assembly. Every reasonable doubt must be resolved in favor of legislative action. The court must determine not whether it is possible to condemn, but whether it is possible to uphold the Act which is attacked; every presumption being in favor of its validity. The statute will not be declared invalid unless, in the judgment of the court, its unconstitutionality is shown beyond a reasonable doubt. (*State ex rel. Wallace* v. *Callow,* 78 Mont. 308, 254 Pac. 187; *Mills* v. *Stewart,* 76 Mont. 429, 247 Pac. 332, 47 A. L. R. 424; *State ex rel. Boone* v. *Tullock,* 72 Mont. 482, 234 Pac. 277; *Martien* v. *Porter,* 68 Mont. 450, 219 Pac. 817; *Hale* v. *County Treasurer of Mineral County,* 82 Mont. 98, 265 Pac. 6.)

Under the above rule, we therefore hold that section 378 of the Revised Codes of 1921, applying to the Justices of the

supreme court who assumed office after its enactment, is valid and constitutional.

The final questions for determination are: Did the answer ▮▮▮▮▮▮ set forth any valid defense to the action? If so, does the evidence furnish any support for the findings of fact, conclusions of law, and judgment of the trial court? That under the circumstances herein it would be unjust for the trial court to deprive Walter B. Sands of the office to which he was apparently elected.

We have set forth herein the defense of the respondent alleged in his answer as well as substantially the evidence in support and in contravention thereof. The affirmative allegations of the answer present a plea by respondent of his good faith in making the statements, declarations, and announcements as set forth herein, and appellant contends that such plea as alleged does not constitute a defense; that it is not grounded on good faith, but on the age-old plea of ignorance of law, and cites numerous cases upon the doctrine that ignorance of the law excuses no man.

"Good faith" is a defense in a contest of this nature by the provisions of section 10803, Revised Codes 1921, and that section does not in any manner set forth what shall constitute "good faith." It does not say mistakes of law, miscalculation of law, misinterpretation of law, and all other matters of like nature shall not be a defense. "Although in its original and popular sense the term 'good faith' denotes honesty of purpose, absence of bad faith, yet it is popularly used to denote the actual existing state of the mind, without regard to what it.should be from given standards of law and reason. It does not always require sound judgment and business sagacity." (28 C. J., sec. 9, p. 715.) All that is required is a statement of facts showing the good faith of the candidate. In his answer contestee averred that he in good faith believed, and so stated, that the law purporting to authorize payment of the $1,500 annually to each of the Justices of the supreme court was unconstitutional; that his oral and printed statements were his declaration of principles in which he believed and for which

he stood, and were made for no other purpose than to inform the electors thereof.

Contestee had reasonable grounds for believing that such law was unconstitutional, and if it was unconstitutional, it was no law at all (*Hamilton* v. *Board of County Commissioners*, 54 Mont. 301, 169 Pac. 729), and if such law was unconstitutional, the contestee was right in his statements that the only salary provided by law for the supreme court Justices was the sum of $6,000 per annum, and if the law was unconstitutional, he had a right to inform the electors of that fact. If he was not permitted to do so, he was deprived of his right freely to speak, write, and publish the principles for which he stood; and if the provisions of the Corrupt Practices Act prevented him from doing so, it is in contravention of section 10, Article III of the Constitution of the state of Montana (*Fordham* v. *Stearns*, 122 Or. 311, 258 Pac. 822). The question is, Did the contestee honestly and conscientiously believe that section 378, supra, was unconstitutional, having reasonable grounds for that belief? He has so alleged in his answer, and the plea of good faith therein averred states a defense.

The trial court found that in making the statements, declarations, and admissions, the contestee acted in good faith, and as election contests involving the right to office are actions at law (*Cadle* v. *Town of Baker*, 51 Mont. 176, 149 Pac. 960; *Poe* v. *Sheridan County*, 52 Mont. 279, 157 Pac. 185; 10 Cal. Jur. sec. 65, p. 112; *State ex rel. Schumacher* v. *Markham*, 160 Wis. 431, 152 N. W. 161), if there is any substantial evidence in support of the above finding of the trial court, we are bound by such finding. (*Cellars* v. *Dwinnell*, 87 Mont. 73, 285 Pac. 181; *Teagarden* v. *Calkins*, 55 Mont. 35, 173 Pac. 549; *Silver* v. *Morin*, 74 Mont. 398, 240 Pac. 825.)

The contestee testified that for years he had considered Senate Bill 30 (page 72), Laws of 1899, which is now section 378 of the Revised Codes of 1921, unconstitutional; that he had discussed the question many times with numerous lawyers; that he had investigated the constitutionality of the Act to some

extent; and several attorneys at law of long standing in the practice of this state testified in the contest that they held the same opinion and so informed the contestee. We think there is substantial evidence supporting the finding of the trial court that contestee acted in good faith.

Judgment affirmed.

HONORABLE O. F. GODDARD and HONORABLE STEWART MC-CONOCHIE, DISTRICT JUDGES, sitting in place of the CHIEF JUSTICE and ASSOCIATE JUSTICE STEWART, disqualified, concur.

MR. JUSTICE MORRIS and HONORABLE J. E. ROCKWOOD, DISTRICT JUDGE, sitting in place of MR. JUSTICE ANDERSON: We dissent. The majority opinion holds, in substance, that the contestee was guilty of violating the Corrupt Practices Act as charged, but affirms the trial court for the alleged reason that there is substantial evidence in the record to support the findings of the trial court that the violation of the Act by the contestee was made in good faith. No other reasons are assigned for affirming the judgment. The majority does not hold, nor intimate, that the judgment of the trial court is supported by a preponderance of the evidence, but only by "substantial evidence," and contends that the established rule of this court prohibits us from reversing the judgment if there be any substantial evidence to support it. We concede the rule as stated is correct in law actions, but emphatically deny its proper application here (1) for the reason that the rule relied upon by the majority, as mentioned above, does not apply when the testimony given was all by one witness; (2) the plea of good faith, being an affirmative statutory plea, must be supported by a preponderance of the evidence; (3) the action here is not strictly an action at law but a statutory proceeding partaking of some of the features of an action in equity; (4) the acts and pronouncements of the defendant, both during the campaign and through all the court proceedings, discredit the plea of good faith, and his testimony that he made and pub-

lished the incriminating statements alleged in the petition and admitted by respondent, in good faith, is not "substantial evidence."

On the first proposition, that the rule relied upon by the majority to support the finding of the district court does not apply when the testimony is all given by one witness, with the exception of a number of the attorneys representing the respondent whose testimony was in the nature of that of expert witnesses, the only testimony found in the record which can be said to lend any support to the finding that the contestee acted in good faith, is the statement made from the witness stand by the contestee himself to the effect that he made the utterances and caused the publications which the majority opinion holds to be in violation of the Corrupt Practices Act. At the outset it should be kept in mind that the evidence upon which the majority finds contestee violated the Corrupt Practices Act is evidence of the acts, publications and utterances made and done during the campaign when there was no cloud upon the horizon threatening the loss of office if once it were gained, and the plea of good faith, which, if not sustained, leaves the finding of the trial court and the majority here unsupported, was put forward in the heat of battle to save the office admittedly gained by illegal promises. The first part of the evidence being in the nature of *res gestae*, and the latter a deliberate plan conceived by clever counsel to save a client from the penalty of the law.

If the evidence may be said to be in conflict, then the conflict is all within the testimony of the contestee. The rule long recognized by this court that where the evidence is in conflict and the findings of the trial court are supported by substantial evidence the findings will not be disturbed, is without application where, as here, the conflict, if any, is all within the testimony of the one witness. In *Thuringer* v. *Trafton*, 58 Colo. 250, 255, 144 Pac. 866, 868, application of the rule was contended for the same as it is applied by the majority here, but the court rejected such application in the following language:

"True, her evidence was conflicting, but the conflict was internal, within itself, and not with that of any other witness, for no other witness testified on the subject, and the rule in regard to conflicting evidence does not apply in such a case."

In the case of *Casey* v. *Northern Pacific Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 144, this court said: "Counsel for plaintiff insist that the evidence is conflicting, and, since the jury found upon the issues and the lower court denied a new trial, this court is without authority to interfere, but the principal conflicts arise upon the plaintiff's own testimony, rather than in the testimony of opposing witnesses. * * * The corollary of the first rule above is stated cogently in *McAllister* v. *McDonald*, 40 Mont. 375, 106 Pac. 882. It was there held that the supreme court is not authorized to affirm an order denying a new trial: (a) Where the evidence tending to support the verdict is an isolated statement of a witness which is in conflict with his other statements; or (b) when the verdict is contrary to the great weight of the evidence, and the evidence which tends to sustain the verdict is impeached or rendered improbable by conceded facts, or is against all reasonable inferences or probabilities of the case; or (c) when the verdict, though supported by some evidence, is so utterly at variance with the real and unexplained facts that the court can say that it is clearly wrong. The rule has been stated repeatedly in this jurisdiction that a court may reject the most positive testimony, though the witness be not discredited by direct evidence impeaching him or contradicting his statements. The inherent improbability of his story may deny it all claims to respect. [Citing cases.] The credulity of courts is not to be deemed commensurate with the facility or vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude its judgment.'" The rule has its foundation in the assumption that the conflict is real and the supporting evidence is substantial.

In *Morgan* v. *Butte Central Mining & Milling Co.*, 58 Mont. 633, 194 Pac. 496, 498, is was said: "Counsel for claimant con-

tend that, as the appeal is from the judgment of the district court, the rule that 'the supreme court will not reverse the findings of the district court except where the evidence clearly preponderates against them' controls, and that the findings and decision of the board are only indirectly involved. The reason for the adoption of the rule quoted is that in cases where such a rule is applicable the trial court has had the witnesses before it and had the superior advantage of considering their evidence in the light of their demeanor on the stand and the manner in which they testified. Where, however, the trial court renders its findings on the identical record presented to the appellate court, the reason for the rule does not attach; and it is one of our maxims that, 'when the reason of a rule ceases so should the rule itself.' '' (Sec. 8739, Rev. Codes, 1921.)

As indicated heretofore, the trial court did not have witnesses on the stand, but only a single witness. The trial judge could not choose between witnesses as to whom he would believe, but only between fragments of the testimony of the same witness. This case is not within the reason of the rule as indicated by this court in the cases cited.

If, on the other hand, the evidence be not in conflict, then the rule laid down in *Milwaukee Land Co.* v. *Ruesink*, 50 Mont. 489, 498, 148 Pac. 396, 398, applies. Mr. Chief Justice Brantly, speaking for the court, there said: ''The motion for a new trial was made upon several of the statutory grounds, among them that the evidence was insufficient to justify the findings, and that the decision was against law. Apparently these were the only grounds urged at the hearing. There was no substantial conflict in the evidence. This being the condition, the case was stripped of questions of fact, and it remained only for the court to determine the question of law arising upon all the evidence viewed as an agreed statement of facts. (*Helena Nat. Bank* v. *Rocky Mountain Tel. Co.*, 20 Mont. 379, 51 Pac. 829, 63 Am. St. Rep. 628; *Murray* v. *Hauser*, 21 Mont. 120, 53 Pac. 99; *State ex rel. Quintin* v. *Edwards*, 40 Mont. 287, 106 Pac. 695, 20 Ann. Cas. 239.) If a

case is being tried to a jury and the evidence is such that reasonable men can come to but one conclusion thereon, the court may, as the case requires, direct a verdict for the party entitled to it, or withdraw the case from the jury and render judgment. (Rev. Codes, sec. 6761; *Consolidated Gold etc. Min. Co.* v. *Struthers,* 41 Mont. 565, 111 Pac. 152.) So when, as here, the case is submitted to the court without a jury and the evidence justifies but one conclusion, formal findings are unnecessary, though request be made for them in conformity with section 6766 of the Revised Codes. The judgment will not be reversed if the request is disregarded. (*State ex rel. Quintin* v. *Edwards,* supra.) For the same reason, if the court makes them, this court will not reverse the judgment because of defects in them, or any of them, though exception has been reserved because of the defects, under section 6767. In such a case this court will ignore the formal findings, and upon examination of the whole of the evidence, determine whether the conclusion reached thereon by the trial court was correct.''

Referring to the second reason assigned above, the plea of good faith as an affirmative statutory plea, the majority opinion holds contestee violated the Corrupt Practices Act, but by the plea of good faith, a plea in the nature of confession and avoidance, he is exonerated. If the pleadings and proof are sufficient to sustain the conclusion that the contestee violated the Corrupt Practices Act, and such, in substance, is the conclusion of the majority, then certainly a prima facie case was made against contestee, and when a prima facie case was established by the contestant, then the burden was upon the contestee, under the statutes and the rules laid down by the courts, to establish by a preponderance of the evidence this plea of good faith. Such a plea under the statute is necessarily an affirmative plea, a plea of justification for violating the statute; therefore, the rule that a finding of a trial court may not be disturbed on appeal if there is substantial evidence to sustain it has no application here. The burden was upon the respondent to establish his special plea of good faith. (*Barnett*

v. *Kunkel*, (C. C. A.) 259 Fed. 394; *Robinson* v. *Smith*, 207 Ala. 378, 92 So. 546; *Howard & Harper* v. *Chicago etc. Ry. Co.*, 196 Iowa, 1378, 195 N. W. 153; *Hughes* v. *Williams*, 229 Mass. 467, 118 N. E. 914; *Equitable Surety Co.* v. *Sapp*, 77 Okl. 221, 187 Pac. 917; *Davies* v. *Rutland*, (Tex. Civ. App.) 219 S. W. 235; *Fidelity Oil Co.* v. *Swinney*, (Tex. Civ. App.) 260 S. W. 1111.) A party has the burden of proof of a fact peculiarly within his own knowledge. (*City of Anniston* v. *Jewel Tea Co.*, 18 Ala. App. 4, 88 So. 351; *Stevenson* v. *Yates*, 183 Ky. 196, 208 S. W. 820; *Pauley* v. *Business Men's Assur. Co.*, 217 Mo. App. 302, 261 S. W. 340.) One who pleads in confession and avoidance has the burden of establishing facts alleged in avoidance. (*Roux* v. *Indian Lumber Co.*, 119 Fla. 280, 161 So. 270, 271; *Bennett* v. *National Union Fire Ins. Co.*, (Mo. App.) 80 S. W. (2d) 914; *Clarke Garage Co.* v. *Rosenberg*, 13 La. App. 374, 128 So. 62; *Hall* v. *American Insurance Union*, (Mo. App.) 27 S. W. (2d) 1076; *Prince* v. *Kennedy*, 3 Cal. App. 404, 85 Pac. 859.)

Taking up the third reason for this dissent, the term "good faith" is borrowed from equity jurisprudence, and it is said "must be interpreted accordingly." (*Cordenas* v. *Miller*, 108 Cal. 250, 39 Pac. 783, 49 Am. St. Rep. 84; 28 C. J. 715.) If the term must be interpreted according to the rules of equitable jurisprudence, we see no good reason why its use here should not be interpreted accordingly. 4 Words and Phrases, First Series, page 3117, says: "Good faith is the opposite of * * * bad faith, and its nonexistence must be established by proof." This implies the necessity of proof by one who stands upon the plea. The definition appears to be more a comparison than a definition. In *Canal Bank* v. *Hudson*, 111 U. S. 66, 4 Sup. Ct. 303, 28 L. Ed. 354, it was said in connection with a fraudulent transaction, that good faith is that honesty of intention and freedom from knowledge, of circumstances which ought to put him on inquiry. In 2 Bouvier's Law Dictionary (Rawles' Third Rev.), page 1359, "good faith" is in substance defined as an honest intention to abstain from

taking any unconscientious advantage of another, even though the act complained of be within the technical demands of law. Passing to citations from cases in which the question of good faith was an issue, in *Allen* v. *Pioneer Press Co.*, 40 Minn. 117, 41 N. W. 936, 12 Am. St. Rep. 707, 3 L. R. A. 532, it was said in an action for libel, and referring to the publication thereof: "It must have been honestly made  *  *  *  and upon reasonable grounds for this belief, after the exercise of such means to verify its truth as would be taken by a man of ordinary prudence under like circumstances."

The contestee here, after being advised in the premises by the Attorney General, and knowing that salaries which he denounced as illegal had been authorized and paid for more than thirty years, still arrogantly announced in the campaign that $1,500 of the salary was unconstitutional and unearned, and he would not accept it if elected. He made no attempt to invoke the regular processes of the law to verify his contentions, but governed his act by his own arbitrary motions.

In the interpretation of the term "good faith" in section 10803, Revised Codes of 1921, upon which the contestee depends, attention is called to the following: "The terms employed in the statute are presumed to be used in their ordinary sense, unless it is apparent from the context or from the subject-matter that they are used in a different or special sense." (*State ex rel. Anaconda Copper Min. Co.* v. *District Court*, 26 Mont. 396, 406, 68 Pac. 570, 574, 69 Pac. 103; *Scheffer* v. *Chicago, M. & P. S. Ry. Co.*, 53 Mont. 302, 163 Pac. 565; *Vitt* v. *Rogers*, 81 Mont. 120, 124, 262 Pac. 164.) There is nothing in the statute to support any contention that the legislature intended the phrase should be given any other than its usual meaning.

Want of knowledge of the law does not justify a plea of good faith. In *Leggatt* v. *Prideaux*, 16 Mont. 205, 40 Pac. 377, 50 Am. St. Rep. 498, Mr. Justice Hunt, in delivering the opinion of the court, said: "That the justice of the peace believed he had a legal right to charge the fees he did, and acted

in good faith in taxing and collecting the fees, constitute no defense. It would be most dangerous to the welfare of society if an officer elected to administer the law could violate it to his own pecuniary advantage, and escape the consequences of his act by pleading ignorance of the statute he had violated. That ignorance of the law is no excuse is a postulate of law, but, unless the maxim is upheld, there would be innumerable problems presented to courts, and he who knew the least might fare the best; or as is said by the supreme court of California (*People v. O'Brien*, 96 Cal. 171, 31 Pac. 45) 'the denser the ignorance the greater would be the exemption from libililty.' The case is not one where there was a mistake of fact. The court of appeals of New York, in *Gardner v. People*, 62 N. Y. 299, say: 'Such mistakes do not excuse the commission of prohibited acts. The rule on the subject appears to be that in acts *mala in se* the intent governs, but in those *mala prohibita* the only inquiry is, Has the law been violated?' (*People v. Brooks*, 1 Denio (N. Y.), 457 [43 Am. Dec. 704]; *Beckham v. Nacke*, 56 Mo. 546; *Commonwealth v. Emmons*, 98 Mass. 6; *Carr v. Trainor*, 36 Ill. App. 587; *Roberge v. Burnham*, 124 Mass. 277; *People v. Monk* [8 Utah, 35], 28 Pac. 1115.) The receiving of the illegal fees is the gist of the wrong under the statute, and, when such fees are deliberately accepted, the law is violated, and the liability attaches." Here "the gist of the wrong under the statute" was contestee's offer to serve for less than the salary fixed by law. Ignorance of the law was not a legal excuse. Particular attention is called to the first portion of the foregoing quotation where Mr. Justice Hunt said that the fact that the justice of the peace believed he had a legal right to charge the fees and he acted in good faith constituted no defense.

In *State ex rel. Wynne v. Examining & Trial Board*, 43 Mont. 389, 117 Pac. 77, 80, Ann. Cas. 1912C, 143, where again a party was charged with violating the law by charging illegal fees, it was said: "It is contended for the relator that he acted in entire good faith; * * * but he cannot be heard to make such claim."

Again, in the case of *State ex rel. Rowe* v. *District Court*, 44 Mont. 318, 119 Pac. 1103, 1106, Ann. Cas. 1913B, 396, Mr. Chief Justice Brantly, delivering the opinion of the court, also referred to the opinion of Mr. Justice Hunt quoted above, and stated in the course of the opinion: ''Ignorance of law cannot be urged as an excuse for a violation of it. Nor is good faith, under such circumstances, any justification or excuse. [Citing cases.] 'The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement. If a person accused of crime could shield himself behind the defense that he was ignorant of the law which he violated, immunity from punishment would in most cases result. No system of criminal justice could be sustained with such an element in it to obstruct the course of its administration. The plea would be universally made, and would lead to interminable questions incapable of solution. Was the defendant in fact ignorant of the law? Was his ignorance of the law excusable? The denser the ignorance, the greater would be the exemption from liability.' ''

The question inevitably arises, Why did not the contestee, being under the obligation due from all prudent men under such circumstances, institute a proper court action to test the constitutionality of the statute relating to the salaries of justices? He testified that he had believed the law invalid for several years, and the record shows he had had an extended controversy with the Secretary of State over the correct amount of the filing fee when he became a candidate for Chief Justice which the secretary called upon the Attorney General to solve, and contestee was advised by the Attorney General that the legal salary was $7,500. He undertook to force the Secretary of State, not by a legal action, but by much contention, to accept a filing fee based upon a $6,000 salary. As a lawyer he must have known the secretary could not accept a fee fixed on any other salary than the amount recognized as legal and drawn by every justice for the last thirty years; yet in the face of such presumed knowledge contestee continued to agitate the

28

matter, and paid the extra $15 of the fee under protest. The resulting advertising arising from the newspaper notoriety following was no doubt considered good for a candidate just launching a campaign. It is quite obvious that contestee believed this salary question was his prize campaign issue, as it was given first place on all the four lots of campaign cards gotten out and circulated by him. He testified he discussed the issues over the radio and on the stump. So by this line of evidence we arrive at the obvious answer of why contestee did not test the matter in court instead of using it as his prize issue. A special proceeding could have been brought on an agreed statement of facts directly in the supreme court, and being an action that was entitled to preference, argued and decided long before the general election. But by that course the candidate would have been deprived of his prize campaign issue, and many a vote would, in all probability, be lost. The purpose is revealed and the plea of good faith is thus stripped of its garb in which it had been decked out for public consumption as an issue of economy, and in its nakedness we behold a glaring political trick, spread abroad over the state impugning the integrity of every individual who had occupied a place on the Supreme Bench of the state in the last thirty years. "Good faith" demanded that contestee submit the question to the regularly constituted tribunals of the state for adjudication before charging that all other members of the court were filching thousands of dollars from the state treasury illegally. It must be remembered that he did not say that, in his opinion, the law was unconstitutional, but made the bold, unqualified statement that $1,500 was "unearned and unconstitutional." From the statement on all his cards he might just as well have said, "all Justices for the last thirty years have stolen $1,500 each, each year for thirty years out of the state treasury." He made the positive statement with such assurance as to carry the notion that the question was determined and fully settled. He assumed to announce a conclusion with all the positiveness of a deliberate court decision and for the

avowed purpose of securing votes, and then, when haled into court to answer for his false statements, comes here on a plea of good faith! A plea contradicted by contestee's own testimony from the witness stand under oath. On cross-examination contestee replied to questions as follows:

"Q. It was your intention that these campaign cards be read by the voters? A. Certainly.

"Q. You wanted them to read them? A. Yes, sir.

"Q. And act on them in accordance with the suggestions there made? A. Yes, sir.

"Q. That was for the purpose of being elected Chief Justice? A. Yes, sir.

"Q. The material was conceived by you with the view of bringing about that result? A. Yes, sir."

Here we have the whole story about the later claim of "good faith" and the announcement of "principles" for which the candidate stood, not in the campaign but in his defense in this action. If testimony in support of such a plea, under circumstances such as exist here, is entitled to any weight or consideration whatever, then the Corrupt Practices Act "to secure and protect the purity of the ballot" is an empty farce and utterly futile for the purposes expressed in its title. To contend for the construction placed upon section 10803, Revised Codes 1921, by the majority, is to assume that the people, when they initiated the Act, intended to stultify themselves by incorporating therein a provision which would practically defeat the very purpose they professed to have in view by its initiation.

It is one of our tenets of government held in particular regard, that all stand on an equality before the law, but it is particularly repugnant to one's sense of fairness and justice to hold that one who aspires to the exhalted position of the highest judicial office of a sovereign state, owes no higher duty in the observance of the law than the average citizen, and to contend that the contestee in this case should be excused for a plain and palpable violation of the law because he believed it

invalid is to cheapen and degrade the court of which the contestee is a member, and to make a plea of ignorance a shield for corruption. When the contestee was charged with the violation of the Corrupt Practices Act he should have been the first to demand and require a trial of the matter on its merits without undue delay; but one dilatory move after another was made obviously for the purpose of preventing the action from being heard on its merits.

Recognition of the law is the basis of our liberties and our greatness, and its commands cannot be disregarded with impunity; personal regard and sympathy have no part in its domain; and, in our view, a plea of good faith here is not only specious to the last degree, but reprehensible under the facts and circumstances shown by the record.

The judgment should be reversed and the cause remanded to the district court, with instruction to grant the contestant's motion for judgment on the pleadings.

Rehearing denied September 21, 1936.