STATE EX REL. HALL, RELATOR, *v.* NIEWOEHNER, RESPONDENT.

(No. 8564.)

(Submitted December 4, 1944. Decided December 19, 1944.)

[155 Pac. (2d) 205.]

438

*Mr. R. V. Bottomly,* Attorney General; *Mr. Fred Lay,* First Assistant Attorney General, and *Mr. H. C. Hall,* Special Prosecutor, for Relator, filed a brief.

*Messrs. E. J. Stromnes, Timothy Nolan, J. F. Sullivan, Horace S. Davis,* and *George E. Niewoehner,* for Respondent, submitted a brief.

Opinion: PER CURIAM.

This is a contempt proceeding.

440

Respondent, George Niewoehner, is an attorney at law admitted and licensed by this court to practice before it.

On Saturday, October 7, 1944, respondent came to the office of the clerk of this court and there delivered for filing and presentation to the court a typewritten motion. He also left with the clerk five copies of such motion. The motion reads:

"In the Supreme Court of the State of Montana.

"In Re the minutes of the Supreme Court

"Motion for an Order Directing that the Minutes and Records of the Supreme Court of the State of Montana be Purged of Misleading Entries and Made Whole.

"Comes now George Niewoehner, Esq., as an officer of the above entitled Court, and in support of his motion to be presently made represents and alleges:

"That on or before July 7, 1941, Mr. Justice Leif Erickson abandoned his duties and prerogatives as Justice of the Supreme Court of the State of Montana, and thereupon accepted employment as a referee for the National Railroad Adjustment Board, all in violation of his oath of office, and in breach of his trust to the people;

"That Mr. Leif Erickson did continue such abandonment and neglect until and including September 8, 1941;

"That on or before May 12, 1943, Mr. acting Justice Leif Erickson did again abandon his duties and prerogatives as Justice of the Supreme Court of the State of Montana, and thereupon again accepted employment as a referee for the National Railroad Adjustment Board, all in violation of the Montana Constitution, in violation of his oath of office, and in breach of his trust to the people;

"That Mr. Leif Erickson did continue such abandonment and neglect until and including June 6, 1943;

"That on or before July 15, 1943, Mr. acting Justice Leif Erickson did still again abandon his duties and prerogatives as Justice of the Supreme Court of the State of Montana, and thereupon did still again accept employment as a referee for the National Railroad Adjustment Board, all in violation of

the Montana Constitution, in violation of his oath of office, and in breach of his trust to the people;

"That Mr. Leif Erickson did continue such abandonment and neglect until and including September 11, 1943;

"That Mr. Leif Erickson thus served the National Railroad Adjustment Board, in violation of the Montana Constitution, in violation of his oath of office, and in neglect of his duties to the people of Montana, for the following periods:

"July 7, 1941, to September 8, 1941, inclusive, a period of sixty-four (64) consecutive days,

"May 12, 1943, to June 6, 1943, inclusive, a period of twenty-six (26) consecutive days,

"July 15, 1943, to September 11, 1943, a period of fifty-nine (59) consecutive days, which all told made a total time in service for the National Railroad Adjustment Board of one hundred forty-seven (147) days;

"That for his services as referee for the National Railroad Adjustment Board, Mr. Leif Erickson was paid the sum of Seven Thousand Three Hundred Seventy-five Dollars ($7,-375.00) at the rate of Fifty Dollars ($50.00) per day, and did receive expenses and per diem in the amount of One Thousand Two Hundred Sixty-seven Dollars ($1,267.00), making a total payment of Eight Thousand Six Hundred Forty-two Dollars ($8,642.00) received for one hundred forty-seven (147) days of unlawful and unconstitutional employment outside his duties as Justice of this Court;

"That Mr. Leif Erickson did let, and still lets, the Minutes of this Court indicate that he served the people of Montana during these one hundred forty-seven (147) days, and that he has made statements under oath to support salary claims against the State Treasurer of the State of Montana covering these identical days;

"That in addition to the Eight Thousand Six Hundred Forty-two Dollars ($8,642.00) he received for employment outside this state, Mr. Leif Erickson has drawn his full salary as Justice from the State of Montana for the same one hundred forty-

seven (147) days at the date of Seven Thousand Five Hundred Dollars ($7,500.00) a year;

"That as a result of the facts alleged hereinabove the said Mr. Leif Erickson has in fact and in truth neglected his duties as a Justice since July 7, 1941, and has much of the time been absent earning wages for himself at the rate of Fifty Dollars ($50.00) per day, together with expenses and per diem, when the Supreme Court was in session;

"That as a result of said facts Mr. Leif Erickson has not been a *de jure* justice of the Supreme Court since the year 1941;

"That despite the aforesaid facts, many of them known to other Justices of this Court, the Minutes of this Court have continued to indicate the said Leif Erickson as being present when he was in fact absent;

"That the official records of the cases decided by the Supreme Court, and the official printed reports of those decisions, make it appear that in many of these cases and decisions Mr. Leif Erickson properly participated by exercising the judicial discretion vested in him by the people of the State of Montana when in fact and in truth Mr. Leif Erickson did not so properly participate and exercise his discretion in those cases and decisions;

"That as they now stand the Minutes of the Supreme Court of the State of Montana are misleading and are not a true representation of the conduct of Mr. Leif Erickson as a Justice of the Supreme Court of the State of Montana, making it impossible for the people of Montana to ascertain the true fashion in which the business of their Supreme Court has been conducted;

"That the matters and things alleged hereinabove are calculated to destroy the integrity and dignity of the Supreme Court of the State of Montana, and that the Constitutional rights and guarantees of the people of Montana are thereby imminently jeopardized;

"That your petitioner being an officer of the Supreme Court,

it is his duty to endeavor to have the Minutes of the Supreme Court rectified;

"Now, therefore, I move the Supreme Court for an order directing that the Minutes and records be purged of all those entries which make it appear that Mr. Leif Erickson was present in Court when in fact he was not, or which make it appear that Mr. Leif Erickson was properly participating in the decisions of the Court when in fact he was not, and directing that the Minutes and records be made to show that Mr. Leif Erickson was absent from Court when he was in fact absent, and be made to show that Mr. Leif Erickson did not participate in those cases and decisions in which he in fact did not properly participate by exercising the judicial discretion vested in him by the people of the State of Montana.

"George Neiwoehner"

Upon receiving the motion the clerk promptly presented it to the Chief Justice together with the five copies for the use of the Justices, subdivision 3 of Rule XI of the published rules of this court providing that, "Unless otherwise ordered, a motion will be considered and disposed of without oral argument."

On Monday, October 9, 1944, being the next business day, the respondent mailed to all the members of the bar of this state a mimeographed copy of the motion together with a letter signed by him. The letter reads:

"George Niewoehner

"Lawyer

"White Sulphur Springs, Montana

"October 9, 1944

"Dear Sir:

"When you have finished reading this letter you may throw it away and dismiss the whole affair from your mind, if you wish. What you think of my experiences is none of my business.

"In three sentences I am going to tell you why I have taken the trouble to send this mimeographed letter to every lawyer in the state. The people of Montana, including the lawyers, have the right to have the records of the Supreme Court show what

business is transacted by the Supreme Court, how and when the business is transacted, and what Justices participate. Despite this right, I believe that the Minutes do not show how the Supreme Court took care of a certain matter entitled 'In Re the Minutes of the Supreme Court.' Therefore I am going to give you the facts, with no comment whatsoever—draw your own conclusions.

"Just before noon on Thursday, October 5th, I called the Marshal of the Supreme Court, told him I would have an ex parte matter to be heard at 10:00 A. M. on Saturday, October 7th, and asked him to notify the Justices and have them on the Bench at that time. I did not give him any information as to the nature of the case. He said he would do as requested. Early that afternoon the Marshal advised me he had notified Justices Johnson, Anderson, Morris and Adair, and that those Justices said they would be present.

"Then I went to the Court's noticing board upon which matters to be heard are noticed, and there was a notice on the board that there would be a matter at 10:00 A. M. on Saturday. My name appeared in the notice thus: ' (Niewoehner) '.

"On Saturday, October 7th, I was waiting at the office of the Clerk of the Supreme Court at ten minutes to 9:00 A. M. when the Clerk arrived. I asked the Clerk to file a Motion, gave him the Motion and five copies thereof, and gave him a ten dollar bill for the filing fee. A copy of the Motion is enclosed herewith.

"Thereupon the Clerk said he would not file any papers I might have, that he would transmit the Motion to the Justices, and that I would be advised as to what the Court would do.

"I waited, ready, until and after 10:00 A. M. The Justices did not take the Bench.

"At about five minutes after 10:00 A. M. the Clerk took me into his office, told me I would not be heard, and told me that the Court would notify me as to what it would do at some indefinite time in the future. The Clerk returned my ten dollars.

"Thereafter, I looked again at the bulletin board, and the notice of the hearing which I was to have had was still there.

"Thereafter I looked at the Minutes of the Court. There was no entry covering this item of business.

"Yours very truly,

"Enc. copy of motion. George Niewoehner"

On October 14, 1944, H. C. Hall, Esq., an attorney at law and officer of this court, presented to the court an affidavit charging, among other things, that the respondent did the aforesaid acts and thereby committed contempt of this court.

The accusatory affidavit was filed and, upon order made, citation was issued and served on respondent requiring him to show cause, on a day certain, why he should not be adjudged in contempt and punished accordingly.

*Motion to Disqualify Justices.* On October 25, 1944, respondent appeared by his attorneys and filed herein a motion for an order to disqualify four of the five Justices of this court, or, in the alternative, for an order disqualifying herein the Chief Justice and Associate Justice Erickson.

The ground urged for the disqualification of the four Justices was that they are alleged to have prejudged the matter in that on October 14, 1944, they joined in making an order for the issuance of citation wherein is recited the alleged conduct of respondent of which complaint is here made. In *State ex rel. Short* v. *Owens,* 125 Okl. 66, 256 Pac. 704, 708, 52 A. L. R. 1270, the court overruled a like motion made by respondent therein, saying: "While * * * he contends that the challenged Justices informed against and are prosecuting him in this action and it is true the rule to show cause and the action was begun at the instance of this court, surely respondent does not have the temerity to assert that in the proper case the court against which a contempt is committed is without power to act, and, having moved to bring the matter to trial, is therefore disqualified. Such is not and never has been the law."

It is also manifest that the order for the issuance of a citation for contempt is no more a prejudgment or a conviction than the order for an alternative writ, or an order made by a district judge during the course of a trial directing the county attorney

to file an information against a witness for perjury. (33 C. J. 1009, 1010, sec. 167.)

The alternative of the motion was that Chief Justice Johnson ▮ and Associate Justice Erickson were disqualified because they had both served as referees with the National Railroad Adjustment Board and had a personal interest in the determination of the question as to the propriety or legality of such service. As noted below, that question was not an issue in either the motion to amend records, or in this proceeding, although it would seem that respondent's purpose throughout has been calculated to give that public impression. Manifestly the question cannot be adjudicated in this case and no member of the court is disqualified by his possible interest in the question.

Respondent's original motion contains lengthy allegations as to the service of Mr. Justice Erickson as a referee with the board. It sets out the daily compensation paid him for this service. It contains a statement as to the total amount paid him, including even his railroad fare. It charges that such service by him was in violation of the Constitution of Montana, but it asks no order of the Court based upon these charges or any of the other allegations set forth above. The motion does not seek any ruling that service by a Justice of the Montana Supreme Court at the call of the federal government as an arbiter in labor disputes violates the Montana Constitution. It does not ask that a forfeiture of his office be worked. The motion does not seek the recovery of any monies from Mr. Justice Erickson. Under its allegations not only is it impossible to determine any of these questions in which Mr. Justice Erickson might have such a personal interest as to disqualify him, but the motion does not ask for the determination of them. The only ostensible purpose of the motion is to seek a correction of the minutes and records of the Court. The relief that could be granted or denied on this motion affects the clerk of the court and the court itself and not any of the Justices, and this is true of Justices Erickson and Johnson as well as of the other three members of the court.

It was also contended that the two Justices in question were

disqualified because respondent had summoned them as witnesses on his behalf to testify concerning Associate Justice Erickson's absences and concerning his service and payment as a referee during those absences and concerning the manner of preparing and signing the minutes, records and decisions of the Court. As noted, the Justice's service or payment as a referee was not an issue in the case, and since the minutes and records did not indicate that the member was present when he was alleged to have been absent it was not material to the issues whether he was actually absent or not, or in what manner the minutes, records and decisions of the court were prepared and signed. Where the calling of a judge as a witness is relied upon for his disqualification in proper cases, the materiality and the necessity for his testimony must be shown. (*State ex rel. Short* v. *Owens,* supra; *Johnson* v. *Wells,* 5 Okl. Cr. 599, 115 Pac. 375; *Dancy* v. *Owens,* 126 Okl. 37, 258 Pac. 879; *Goad* v. *State,* 43 Okl. Cr. 411, 279 Pac. 927.) Here the affidavits annexed to the motion showed neither the materiality of the evidence sought to be adduced, nor the necessity for obtaining it from these particular witnesses. In fact at the trial respondent did not call the witnesses but the desired evidence concerning Justice Erickson's absences and his service and payment as a referee with the National Railroad Adjustment Board was stipulated by the parties, subject to objection as to its materiality.

The action is not for the benefit of any of the Justices. In *State ex rel. Metcalf* v. *District Court,* 52 Mont. 46, 56, 155 Pac. 278, 281, L. R. A. 1916F, 132, Ann. Cas. 1918A, 985, this court speaking through Mr. Justice Holloway said: ''The power to punish for contempt is in its nature a trust reposed in the courts, not for themselves, but for the people whose laws they interpret and whose authority they exercise. (*Watson* v. *Williams,* 36 Miss. 331.) While a court which would hesitate to use the power when the circumstances warrant would be guilty of craven faithlessness to duty it is always to be kept in mind that such power is imperious in its nature and summary in its execution. Under the law as it has been modified to harmonize

with the genius of our institutions, the very judge who is libeled may become complainant, prosecutor, witness, and judge.'' (See, also, *State ex rel. Short* v. *Owens,* supra; *Owens* v. *Dancy,* 10 Cir., 36 Fed. (2d) 882.) ''Contempts of court are punished as offenses against the administration of justice, and not as personal affronts to those who exercise judicial functions, * * *.'' (*Ex parte Sullivan,* 10 Okl. Cr. 465, 138 Pac. 815, 818, Ann. Cas. 1916A, 719.) Accordingly this court held in *In re Nelson,* 103 Mont. 43, 60 Pac. (2d) 365, in an opinion concurred in by Justices John A. Mathews, Ralph J. Anderson, Samuel V. Stewart and Claude F. Morris, that it was not objectionable for Associate Justices Stewart and Anderson to testify to material matters and also to participate as members of the court. In his attempt to disqualify two of the Justices of this court on account of their being subpoenaed as witnesses on his behalf, respondent relies principally upon a certain *dictum* of this court in its recent decision in *State ex rel. Moser* v. *District Court,* 116 Mont., 305, 151 Pac. (2d) 1002, where the court quoted with approval from the decision of the Criminal Court of Appeals of Oklahoma in *Ex parte Owens,* 37 Okl. Cr. 118, 258 Pac. 758. The author of the *Moser* opinion failed to note that at the beginning of the report of *Ex parte Owens,* supra, in the Pacific Reporter there appears this notation: ''For opinion of Supreme Court quashing and annulling this opinion, see 258 Pac. 879.'' He did, however, write [151 Pac. (2d) 1008]: ''See, also: *Dancy* v. *Owens,* 126 Okl. 37, 258 Pac. 879.'' In *Dancy* v. *Owens* last cited, the Supreme Court of Oklahoma expressly quashed, vacated, set aside and held for naught the decision in *Ex parte Owens,* supra, and branded it as ''misleading to other courts of the state, and destructive of the judicial system of which this court is the head.'' [126 Okl. 37, 258 Pac. 887.] Thus this court's *dictum* in *State ex rel. Moser* v. *District Court,* supra, is based upon a decision which is not the law of Oklahoma and which is contrary to the law of Montana as is expressed in *State ex rel. Metcalf* v. *District Court,* supra, and in *In re Nelson,* supra, which we deem to be the law of this state.

The motion for an order to disqualify the justices, being without merit, was denied.

In response to the citation and order to show cause, the respondent on November 21, 1944, appeared before this court in person and by his attorneys and the matter was heard. At the hearing respondent presented seriatim (1) a motion to quash the citation, (2) a special plea in bar, (3) an oral plea of "Not Guilty," and (4) a written answer.

*Motion to quash.* In the accusatory affidavit affiant states that he "is informed and believes" certain allegations therein set forth. In his motion to quash, respondent contends that such allegations so made on information and belief render the affidavit insufficient but this court has held to the contrary. (See *State ex rel. Grice* v. *District Court,* 37 Mont. 590, 97 Pac. 1032, and *State ex rel. Young* v. *District Court,* 102 Mont. 487, 58 Pac. (2d) 1243.) The motion to quash asserts that this proceeding is violative of respondent's rights under section 10 of Article III of the Constitution of Montana and of the First Amendment to the Constitution of the United States, but such objections are not tenable. (See *In re Nelson,* supra.) The motion to quash also urges that in denying respondent's motion to disqualify four, or in the alternative two, of the Justices of this court his rights under section 27 of Article III of the Constitution of Montana and the Fourteenth Amendment to the Constitution of the United States were violated, but we found no merit in this contention and the motion to quash the citation was denied.

*Special Plea in Bar.* On October 14, 1944, this court made an order to show cause setting forth the alleged conduct constituting the alleged contempt and directing that citation issue and be served upon respondent, being Cause No. 8562, but before such cause was heard or determined the accusatory affidavit of H. C. Hall, Esq., in the proceeding now before us was presented and filed and thereupon said prior cause No. 8562 was, upon order of this court, dismissed without prejudice. By a special plea in bar, respondent now urges that under sec-

tion 12229 of the Penal Code such dismissal without prejudice constituted a bar to any further prosecution of the contempt charges against respondent. Section 12229, supra, relates only to criminal prosecutions, which actions must be commenced by the filing of a complaint, an information or an indictment. The present proceedings were not instituted under the provisions of the Penal Code and section 12229, supra, is not here applicable. In *State ex rel. Haskell* v. *Faulds,* 17 Mont. 140, 148, 42 Pac. 285, 288, this court observed that "although such matters may be crimes, and punishable as such, still this does not deprive the courts of the power to punish such acts as contempts." The contempt proceeding itself, while of a criminal nature, is not a criminal prosecution within the meaning of the Criminal Code. (*State ex rel. Flynn* v. *Fifth Judicial District Court,* 24 Mont. 33, 60 Pac. 493.) Furthermore the contempt in question is not within the acts enumerated as misdemeanors under the penal statute (sec. 10944). The special plea in bar failed to state facts sufficient to constitute either a bar or a defense to this proceeding and relator's demurrer thereto was sustained on the authority of *Ex parte Brambini,* 192 Cal. 19, 218 Pac. 569, and *State ex rel. Odenwald* v. *District Court,* 98 Mont. 1, 38 Pac. (2d) 269.

*Accusatory affidavit.* The accusatory affidavit alleges that respondent delivered his motion to the clerk for filing; that he thereafter mailed letters, enclosing copies of said motion, to divers persons throughout the state of Montana; that the motion was intended and calculated by respondent "to place manifestly irrelevant and improper matter in the files and records of this Court, and to use the same for the purposes apart from judicial business, namely for political purposes, and to embarrass, hinder and obstruct the administration of justice, to lessen respect for the Court and to destroy its dignity, all of which such motion tends manifestly to do"; that respondent "has misused his position and privilege as an officer of this Court and has misused this Court's records and the proceedings thereof for purely political purposes"; and that the motion contains irrelevant and

impertinent matters which could not be reflected in the minutes or upon the records of this court as respondent well knew.

*Answer.* In his answer respondent pleads "Not Guilty" to the charges contained in the accusatory affidavit and then avers that the prosecution: (1) Impairs freedom of speech in violation of section 10 of Article III of the Constitution of Montana; (2) denies him due process in violation of section 27 of Article III of the Constitution of Montana and the Fourteenth Amendment to the Federal Constitution; and (3) denies him the privilege of free speech and the freedom of the press in violation of the First and Fourteenth Amendments to the Federal Constitution.

At the hearing, various documents were received in evidence, namely: (1) Respondent's motion for an order directing that the minutes and records be purged; (2) the minutes of the court for the three separate periods of time mentioned in respondent's motion; (3) order of the court of November 15, 1944, denying respondent's motion; (4) letter of October 9th mailed by respondent to the members of the bar of this state; (5) proclamation issued by the Governor proclaiming a general election to be held in the state of Montana on November 7, 1944, to elect, among others, a governor and two associate justices of the Supreme Court; (6) certificate by the Governor that at the primary election held on July 19, 1944, Leif Erickson, now an associate justice of this court, was duly nominated as candidate of the Democratic party for the office of governor; and (7) dissent of Mr. Justice Morris, filed November 17, 1944, to the order theretofore made denying respondent's motion for an order amending the minutes and records of the court.

The clerk testified that on October 7 the respondent delivered to him the original and five copies of respondent's motion, saying that he wished to file them; that the clerk "accepted the papers and transmitted them to Chief Justice Howard Johnson;" and that immediately thereafter he advised respondent what he had done with the papers. Julius J. Wuerthner, an attorney at law, testified that he received through the United States mails at Great Falls, where he resides, respondent's letter

of October 9; that enclosed therewith was a mimeographed copy of respondent's motion; and that the witness knew that similar or identical communications had been received on or about the same date by other lawyers in the city of Great Falls. Counsel for respondent in open court admitted that respondent's signature was affixed to the letter so received by the witness Wuerthner, and relator rested.

Respondent, though present in court, did not testify. It was stipulated by counsel that the respondent was born in the state of North Dakota, United States of America, on the 13th day of March, 1912, and at all times thereafter remained a native-born citizen of the United States. Respondent called the clerk and a correspondent for the Associated Press as witnesses in his behalf but their testimony in no manner tends to contradict any of the charges made in the accusatory affidavit nor any of the evidence introduced by relator. No evidence was introduced by respondent disputing the fact that he delivered the original motion to the clerk for filing or that on the next business day he mailed mimeographed copies thereof, together with his letter of October 9, to every lawyer in the state and respondent has wholly failed to show why such acts and conduct are not contempt of this court.

As will be noted from a reading of the motion, it does not purport to seek a determination of the legality of the justice's service as a referee with the National Railroad Adjustment Board under the provisions of federal law during his periods of absence. In fact there can be no such determination upon an ex parte motion nor in any event without making the interested person a party to the action or proceeding. Nevertheless the greater part of the motion consists of statements, accusations and conclusions of law concerning such extraneous matters.

Respondent's motion was delivered to the clerk and presented to the court on October 7th, being exactly one month prior to the general election of November 7th. Mr. Justice Erickson was a candidate for the office of governor at that election and since the statements concerning said justice set forth in respondent's

motion had no possible reference to the ostensible purpose of the motion it is apparent that respondent had inserted same for other than judicial purposes, namely for political purposes and to influence the outcome of said election. It is a rebuttable presumption which the respondent has not attempted to refute ''that a person intends the ordinary consequence of his voluntary act'' (sec. 10606, subsec. 3).

It is not an issue here whether the extraneous allegations, accusations and legal conclusions are defamatory or scurrilous, or whether they could properly have been used as political campaign material. The issue is simply whether or not the attorney's said conduct is such as to show him guilty of contempt.

As an attorney at law, respondent is chargeable with knowledge of the irrelevancy and impertinency of the matters which he set forth in the motion and which were wholly foreign to the ostensible purpose of the motion. Respondent is likewise chargeable with the knowledge of his duties as an officer of the court; to use it and its files, records and machinery for only bona fide judicial purposes.

In his letter of Monday, October 9, 1944, respondent made a further attack upon the court's minutes because they did not then show any action taken upon the motion which he presented to the court through its clerk on the preceding business day. He further attacks the court because the Justices did not convene at 10 o'clock a. m. on that day to hear his motion, despite the fact that under the published rules and established practice such motions are considered and disposed of without oral argument unless otherwise ordered (subdivision 3 of Rule XI) and that in any event it would be for the court, not the respondent, to set the time for a hearing. He further complains that ''the clerk said he would not file any papers I might have, that he would transmit the motion to the Justices, and that I would be advised as to what the court would do.'' When the respondent delivered his papers to the clerk with directions that they be filed and when the clerk accepted the papers and transmitted them to the Chief Justice for action by the court, the documents

were then and there filed and before the court, irrespective of anything that the clerk may have said or whether or not he then stamped, marked or wrote any filing memoranda or data on the papers. ''A paper is filed when it is delivered to the proper officer and by him received for filing.'' (21 C. J. S., Courts, sec. 228, p. 427.)

Respondent further complained that shortly after 10 o'clock a. m., the clerk informed him that he would not then be heard and that the court would notify him as to what it would do at some indefinite time in the future. As before stated, the respondent is charged with the knowledge of the rules promulgated and the practice followed in this court and he should have known that he was not entitled to orally argue his motion nor to an immediate decision thereon. He did not specify any particular entry as being erroneous, but made an attack generally upon the minutes covering three separate periods of time during two separate years and time was required to examine the minutes and records for such periods and to consider the charges thus made, and he well knew that time would be required for this study but notwithstanding he sent his letter out on the next business day after filing the motion.

Complaining further, respondent states ''the clerk returned my Ten Dollars.'' The fees of the clerk are prescribed by the legislature. (Sec. 372, Rev. Codes.) No fee is prescribed for the filing of a motion and therefore no fee could be accepted by the clerk for he may not collect any fee not prescribed by law. (*State ex rel. Baker* v. *Second Judicial District Court,* 24 Mont. 425, 62 Pac. 688; *State ex rel. King* v. *Second Judicial District Court,* 25 Mont. 1, 63 Pac. 402.)

Complaining further, respondent states that after the clerk returned his ten dollars, he looked up the minutes of the court and that there was no entry covering this item of business. The minutes are simply brief memoranda of what takes place in court, made by the authority of the court. The minutes do not now nor have they in the past indicated the time of reception or filing of typewritten or printed motions or the time of pay-

ment of appearance fees, nor the amount of fees collected. Clearly the writing and publication of the letter of October 9th constituted contempt. *In Re Shay*, 160 Cal. 399, 117 Pac. 442, 446, the court said: ''That the writing and publication of the letter, if the false statements therein made were believed, would cast discredit upon this court and the Justices thereof, cannot be denied. It falsely imputes to the Justices of this court improper conduct of which they are entirely innocent. Whether made wittingly, or through sheer inadvertence or carelessness, it was a grave breach of his duty as an attorney on the part of Mr. Shay. Apparently it was not intended to be made public. Its recent publication does not appear to have been made at the instance of Mr. Shay or Mr. McKinley, but rather against their wish and will. This fact somewhat palliates the offense. But the writing of such a letter made the publication possible. Its untruthful statements are well calculated to create the false impression that the members of this court are on terms of undue intimacy with powerful litigants. Such a false impression is most mischievous, and must tend greatly to impair the confidence of the people in the integrity of the court. To attempt to create such an impression, even to a few individuals, is a serious violation of duty by one upon whom the law enjoins the utmost fidelity and vigilance to preserve the court and its justices from even the appearance of evil.'' (See also *Falloon* v. *Superior Court*, 79 Cal. App. 149, 248 Pac. 1057; *Daily* v. *Superior Court*, 4 Cal. App. (2d) 127, 40 Pac. (2d) 936.)

The ostensible purpose of respondent's motion was to obtain ▮ from this court an order directing that its minutes and records be purged of entries which respondent alleges falsely represent that one of the Justices was present when in fact he was absent from the seat of government. The only issue tendered by the motion was: Do the minutes and records indicate that Mr. Justice Erickson was present when in fact he was absent from Helena? It is obvious that the major portion of the motion consists of wholly irrelevent and impertinent matters having no bearing on the question of the correctness of this court's

records. This is apparent upon the face of the motion and it was within the sound discretion of this court to forbid such a document from being spread upon its records. The court was empowered to deny the document a place in its files since if already filed, the court had the power to order it stricken therefrom as this court held, with Mr. Justice Morris' concurrence in *Nadeau* v. *Texas Company,* 104 Mont. 558, 69 Pac. (2d) 586, 593, 111 A. L. R. 874. "It is elementary law, of course, that a court has the right to protect the integrity of its own records. Any court of record has that indispensable authority." (*Gaston* v. *Collins,* 146 Kan. 449, 72 Pac. (2d) 84, 87.) "A court of record has general authority over its own records, and they are within its custody and control, particularly so far as they pertain to the court's business and so far as is essential to the proper administration of justice. * * * In exercising control over its records, a court has power to protect them from irrelevant, unimportant or superfluous papers, and to keep the records free from stain and scandal not pertinent to the cause and unnecessary to the decision." (21 C. J. S., Courts, sec. 229, p. 430.)

In *In re Huppe,* 92 Mont. 211, 225, 11 Pac. (2d) 793, 798, this court said: "The obligation which an attorney assumes when he is admitted to the bar includes the maintenance of respect for our courts and judicial officers. This obligation is not discharged by merely observing a courteous demeanor in open court, but includes abstaining, in and out of court, from the use of insulting and libelous language, spoken, written or printed, or other offensive conduct toward judges personally or their official acts. This rule is generally applied only to official acts (*Neel* v. *State,* 9 Ark. 259, 50 Am. Dec. 209), such as stopping a judge on the street and abusing him because of his decision or conduct of a case (*People* v. *Green,* 7 Colo. 244, 3 Pac. 374, 49 Am. Rep. 356), but should be extended to include all misconduct which tends to bring the courts into disrepute. The habit of criticising the motives of judicial officers in the performance of their duties, when the proceedings are not against the officers whose acts and conduct are criticised, as in

the case of a direct proceeding of impeachment, tends to subvert the confidence of the community in the courts of justice and in their administration, and when such criticism is made by an attorney, who is an officer of the court, he is guilty of professional misconduct (*Matter of Rockmore,* 127 App. Div. 499, 111 N. Y. S. 879)."

Section 9908, subdiv. 3, Revised Codes, provides: "The following acts or omissions, in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: * * * 3. Misbehavior in office, or other wilful neglect or violation of duty by an attorney * * *." This provision was before the court in *In re Shay,* supra, wherein the court said: "If the persons thus immediately connected with the court do not observe proper respect toward it, or make statements derogatory to its character, the public regard and confidence would be much more affected than by similar behavior on the part of ordinary citizens not connected with the court or familiar with its proceedings. The court should have greater control of these persons than would be necessary with respect to ordinary citizens. It was for the purpose of giving to the court a means of protection against such attacks upon its character—attacks, as it were, from within—that this subdivision was enacted."

"It is well settled that contempt may be committed by incorporating impertinent, scandalous, insulting or contemptuous language reflecting on the integrity of the court in pleadings, motions, notice of motions, affidavits, and other papers filed in court." (Citing numerous authorities.) (*Hume* v. *Superior Court,* 17 Cal. (2d) 506, 110 Pac. (2d) 669, 674. See, also, *In re Freebourn,* 92 Mont. 585, 19 Pac. (2d) 1115.) In the early case of *Brownell* v. *McCormick,* 7 Mont. 12, 18, 14 Pac. 651, 653, this court said: "In presenting this case to this court, there has been conduct which we must severely condemn. The brief of the appellant contains language attempting to cast reproach upon the proceedings of the court below, and seeking to make it the object of contemptuous wit and ridicule. * * * No character of persons can have a deeper interest in preserving the dignity

of the bench, or maintaining the courtesies of our honorable profession, than the members of the bar, and they should act accordingly. This is one of the avowed purposes for which bar associations are formed, and one of the objects to which their efforts are directed. The language of the brief in this case is reprehensible, as being in violation of the conduct and courtesy due from the bar to the bench, and will not be tolerated.''

In *Owens* v. *Dancy*, 10 Cir., 36 Fed. (2d) 882, 885, the court said: ''Appellant caused the contemptuous pleading * * * to be brought into court and placed among the files in the case to which he was a party for the court's inspection and action thereon. This clearly constituted contemptuous conduct in the presence of the court. As to the facts, the motion filed by appellant was the whole case; and they presented a question of law.''

In *Ex parte Bowles*, 164 Md. 318, 165 Atl. 169, 173, the court said: ''The affidavit as a whole, directly and by necessary inference, impugns the integrity and honesty of the court, and constitutes an attack which the court could not pass without serious impairment of its dignity and standing as an instrument for the administration of justice. The contemptuous language is contained in an affidavit filed among the public records of the court, and directed to it. The court has, and must have, the inherent right and power to maintain and preserve its dignity and decorum, in order that its usefulness be preserved.'' (Citing cases.)

So in the instant case, as to the facts, the motion presented by ▇▇▇▇▇▇▇ respondent and the letter mailed by him to all the lawyers in the state enclosing a mimeographed copy of the motion are the whole case. They present a question of law. They have not been explained. It is apparent that they were intended and calculated by respondent to question and attack the integrity of this court and to lessen, if not destroy, respect for the court. They were intended to embarrass, hinder and obstruct the administration of justice by the court and this they have done. They were calculated to intimidate the court and to coerce its

action but in this they have failed. Accordingly we must find respondent guilty of the offense of contempt of this court.

There is however a mitigating circumstance. Respondent is comparatively inexperienced in practice before this court. A reference to the actions taken by this court, of which we take judicial notice (sec. 10532, Rev. Codes), discloses that the court has dealt with only four prior actions or matters in which respondent has appeared as counsel. Aside from a pending case in which he appears as counsel for the Industrial Accident Board of the State of Montana, all of those cases involved attacks upon Chapter 47 of the Laws of 1941, by which the Legislative Assembly in effect granted military leaves of absence to certain public officers and employees entering the military service of the United States. The first such case was *Gullickson* v. *Mitchell,* 113 Mont. 359, 126 Pac. (2d) 1106, wherein this court held the statute constitutional with Mr. Justice Morris dissenting. There respondent appeared as *amicus curiae* and attacked the constitutionality of the statute. The decision therein has been cited with approval and followed by the courts of California, Kentucky, Utah and West Virginia.

Next in *State ex rel. Niewoehner* v. *Mitchell,* 113 Mont. 617, 139 Pac. (2d) 545, respondent appeared both as relator and counsel. He there sought unsuccessfully a writ of mandate to compel the secretary of state to accept his nominating petition, presented on the last day for filing nominating petitions, in which he sought to be a candidate at the intervening general election of 1942 for the office of attorney general, which was not included in the governor's election proclamation, and which in *Gullickson* v. *Mitchell,* supra, this court had held would not then be open to election because of the military leave allowed under Chapter 47, Laws of 1941, to John Bonner, the attorney general elected by the people in 1940 for a four-year term.

In the third case, *State ex rel. Niewoehner* v. *Bottomly,* 116 Mont. 96, 148 Pac. (2d) 545, respondent again was both relator and of counsel. The action was in quo warranto against R. V. Bottomly, who had been appointed by the Governor under

Chapter 47, Laws of 1941, to perform the duties of the office of Attorney General during the military absence of John Bonner, the officer elected in 1940 for a four-year term. In spite of this court's decisions in *Gullickson* v. *Mitchell,* supra, and in spite of the fact that the office of attorney general did not appear upon the Governor's election proclamation or upon the election ballots, respondent claimed the office by virtue of 124 write-in votes received by him out of some 170,000 ballots voted. The relator was again unsuccessful and again the court upheld Chapter 47, Laws of 1941, Mr. Justice Morris dissenting.

As this court, a half century ago, said speaking through Mr. Chief Justice Pemberton in *State ex rel. Haskell* v. *Faulds,* 17 Mont. 140, 42 Pac. 285, 289: "We have no desire to oppress the respondent. We understand and fully appreciate the delicate and unenviable position of this court in this peculiar case, as we are, in a sense, trying a matter that involves an offense against our own tribunal. We regret that we have felt called upon by a sense of duty to proceed in this matter at all. Only the belief that it was our duty to defend the court and its proceedings from unwarrantable, contemptuous, and calumnious attack has inspired and moved us in the matter."

As above stated, we find the defendant guilty of contempt. It is the order of this court that in accordance with this finding of guilt the respondent, George E. Niewoehner, appear before this court for the pronouncement of judgment on the twentieth day of December, 1944, at two o'clock, p. m.

Note: On December 20, 1944, the Court pronounced the judgment imposing a fine of $250 upon respondent Niewoehner.

(See also Supplemental Opinion of Court at p. 474).

Dissenting opinion, (Filed December 26, 1944.)

Mr. Justice Morris:

I dissent. The opinion by the majority now before us and the one read from the bench just preceding the hearing in this matter, are, in substance, much the same. Such being the fact it may be found advisable to not encumber the Montana and Pacific Reporter with both. If either be omitted it would logic-

ally be the first, and as I do not intend to permit numerous assertions and conclusions of the majority to go unchallenged I shall incorporate the major portion of my dissent to the former opinion in this.

The last opinion like the former by the majority is burdened throughout with one assertion after another that this or that contention of the contemnor is not in issue, or is immaterial; that no one is charged with having violated the Constitution; that no decree is asked to oust any justice from office or to compel him to turn over to the state any monies received for services from other sources than the state and that such questions cannot be determined in this proceeding. It should be obvious to any reasonable mind that it would be futile to commence actions for any such purposes while confronted with court minutes that do not speak the truth as to the absence or presence of any member of the court. One technicality after another was interposed at the hearing, and others are now relied upon to deny any one the right to question the minutes of the court or have them corrected. Technicalities are permitted in court procedure in the interest of reasonable dispatch of litigation, but such technicalities were never intended to shield the judiciary, and particularly members of this court from criticism within appropriate bounds. The numerous quotations from various decisions as to the power of courts to cite and punish for contempt are a waste of time and energy. No one questions such power within legal and rational bounds. It is the abuse of that power that is the problem that confronts us here.

The majority opinion denied respondent's motion to disqualify certain justices of this court to sit in this case. In support of their ruling on that question five Montana cases were cited. In all those cases the proceeding in each when they came here was in the nature of a review of some act or decree of the lower court. The situation is very different here. The parties in all those cases had at all times the unquestioned right, if the rulings of the lower court were adverse, to seek redress from this court. In the case at bar the respondent has no means of redress except

such as the federal courts afford. In none of the cases cited is there any suggestion that Justices of this court might not be disqualified, and section 8868 expressly provides that "any justice * * * must not sit or act as such in any action or proceeding: 1. To which he is a party, or in which he is interested."

The respondent alleged that "the Minutes of the Supreme Court of the state of Montana are misleading and are not a true representation of the conduct of Mr. Leif Erickson," etc. (This allegation in fairness should have named Chief Justice Johnson also.) Such allegation is true as is shown by the dissent of the writer filed November 17, 1944, dissenting to the extended document of the majority filed November 15th entitled "Opinion and Order. Per Curiam." In such dissent it is shown that prior to February 14, 1940, the minutes of this court had at all times preceded the names of the Justices listed thereon by the word "Present," and since that time the word present has not appeared in the minutes. It thus became impossible after February 14, 1940, to determine from the minutes which Justices were present at any particular time and which were absent.

What the purpose of the change in keeping the minutes was does not appear, but it is clear that the result is that all the times that Chief Justice Johnson and Justice Erickson were absent in 1941, 1942, 1943 and 1944 such absence is not shown by the minutes of the Court. Both have stated that they were in Chicago serving on the Railway Adjustment Board. Can they say, or either of them say, that they were not interested in a financial way in keeping off the record in the case at bar the fact that each earned in excess of $7,000 while absent from Montana serving on the Chicago Board, and at the same time drawing their salaries as members of this court. This in my judgment was such an interest as disqualified both under section 8868, to sit in this case. The reputation of both these Justices in serving the state as members of this court was at issue in the Niewoehner hearing, and both were disqualified under section 8868, Revised Codes. It is said by the majority that the affidavit of disqualification of judges does not apply in con-

tempt cases. The disqualification to which they obviously refer applies only to district court judges (see subsection 4 of section 8868).

The part of section 8868 that applies to Justices of the Supreme Court is subsection 1, and it is so clear a child could have no excuse for not grasping its meaning.

The contention that the cause of the respondent was not ''prejudged'' is discredited by almost every move and act of the majority. When Niewoehner first presented his petition for filing, his right to do so was peremptorily denied by the Chief Justice without authority from the Court. Two members of the court were candidates for office and were absent campaigning. Justices Adair and Morris, and the Chief Justice were present. Justice Morris was not advised of the attempt of Niewoehner to file his petition until its filing had been denied. That act alone is sufficient to show that the Chief Justice had prejudged Niewoehner's demands, that he did not mean to give him a hearing. That the proceeding had been prejudicially prejudged is again shown by the order issued by the majority striking from the records the dissent of Justice Morris relative to the citation. Again the majority begun by citing the respondent for direct contempt, showing an intention to make short shift with the respondent by disposing of him in the summary manner provided for direct contempt and were only saved from that blunder by the intervention of lawyer. If there was ever a proceeding that more perfectly shows the cause was prejudged prior to hearing my rather extensive research has not revealed it. In every act and utterance of the majority in the premises since the Chief Justice denied Niewoehner the right to file his petition, it became clearly obvious that Niewoehner was already condemned and the hearing begun on the 21st inst. became a farce.

The supposition that by reason of my dissent to the issuance of the citation I was disqualified, is untenable. The only interest I have in the matter is to preserve the integrity and efficiency of our highest state court, and make it an instrument of justice and not of oppression. The Chief Justice and Justice Erickson

had a pecuniary interest in suppressing a revision of the court's minutes by keeping off the minutes the record evidence of their absence from duty for such length of time as enabled each to receive for services rendered under a power other than the state of Montana some seven or eight thousand dollars each, all of which was received in violation of section 30 of Article VIII of the Constitution of the state. A further supposition is grounded upon the presumption that if all five of the Justices were disqualified no member of the court would be left to call in district judges to compose a court as provided by section 5 of Article VIII of the Constitution is erroneous. The same question was under consideration preceding the case of *Tipton* v. *Sands*, 103 Mont. 1, 60 Pac. (2d) 662, 106 A. L. R. 474, and was readily solved by four Justices disqualifying themselves and the remaining Justice calling in four district court judges who upon assembling determined that the remaining Justice could disqualify himself, and the court, speaking through the four district judges, could call in an additional judge to make up the court of five, but the four district judges preferred to have the remaining Justice sit with them. Either course would furnish a court no member of which had any pecuniary or other selfish interest in the issues involved here. Such a court in the case at bar would have provided a court removed from natural antagonism toward Niewoehner resulting from personal criticism. It would have been a wise course to have harkened to the advice of the State Bar Association submitted with the approval of the President and all the Executive Committee that all five members of the Court should disqualify themselves. Personally I would have been happy to comply with that advice whether I believed I were disqualified or not.

The defense against disqualification grounded on the common law relative to the necessity of the Justice having a "substantial or direct interest in the event of the litigation" illustrates the absurd extent to which the majority are driven in their efforts to evade the odium attaching to the palpable violation of section 30 of Article VIII of the Constitution which provides: "No

justice of the supreme court nor judge of the district court shall accept or receive any compensation, fee, allowance, mileage, perquisite or emolument for or on account of his office, in any form whatever, except the salary provided by law."

Note: "No justice shall receive any compensation, allowance, perquisite or emolument *for or on account of his office,* in any form whatever, except the salary provided by law." What was the fifty dollars per day received by each of the two justices mentioned if it were not *emolument* on account of his office? Under the practice of the National Mediation Board, 45 U. S. C. A. secs. 151 et seq., and page 46 of the Eighth Annual Report of the National Mediation Board, members of the supreme courts of the various states were called to sit on the National Railroad Adjustment Board, hence it was by reason of their being members of this court that the two Justices were chosen to sit on the Chicago Board and receive $50 each per day.

The majority attempt to make it appear that the $50 per day and expenses received for services as a member of the Chicago Board were not a "pecuniary interest" in the *Niewoehner Case.* It is clear that Niewoehner is attempting to have this court take official notice of the practice of some of its members in accepting office on the Railway Adjustment Board receiving emoluments therefor other than their salaries as members of the court, in violation of the provisions of the Constitution, and to make official record in the minutes of the Court of the fact of such absences. Such official record would jeopardize the office and salary of the member in such a way as to give him a direct interest and a pecuniary interest in any attempt to make an official record of his absence from the court. Such situation gives any member of the court who has absented himself as hereinbefore mentioned a direct and pecuniary interest in the *Niewoehner Case* if his absence were shown to be illegal. Certainly no member of this, the court of last resort in the state, should permit a technicality to be advanced to avoid a decision on the question of whether or not he is biased when a charge to that

effect is seriously brought against him. (See *Cooke* v. *United States*, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767.)

The high-sounding words of the majority to the effect that the prosecution of Niewoehner, "can only inure to the benefit of the people of the state" are merely the old red herring device to distract attention from the real question involved in the controversy. That is, Did members of the Supreme Court hire themselves out to another power for money illegally? The majority should remember that it is not what others say of us that tends to destroy the confidence in and respect for the courts, but just such arbitrary, arrogant and tyrannical acts as have characterized this proceeding from its inception. Of course courts have the power and it is their duty to preserve decorum and demand respect in the course of the administration of justice, but that has nothing to do with unwarranted exercise of power in securing such results.

*State* v. *Murphy*, 68 Mont. 427, 219 Pac. 629, 630, is cited to support the contention that the minutes of the court import verity and cannot be overcome by extrinsic evidence. Such conclusions in that case were predicated upon the presumption that the minutes were "made and kept pursuant to law." It is idle to contend that when the records of a court contain false and misleading statements that no evidence may be introduced to show such false and misleading entries. All that the Niewoehner petition asked was in effect that our minutes be corrected to speak the truth. By merely listing the names of the members of the court the minutes show nothing as to the presence or absence of any Justice. By showing the minutes are incomplete does not challenge the rule that they import verity as to so much as is recorded but brings in issue vital facts known to exist from other evidence that does not appear in the minutes.

Let us see what this court said, speaking through Chief Justice Callaway, in *State* v. *Poole,* 68 Mont. 178, 216 Pac. 798, about amending court records. In that case the defendant had appealed from a conviction of murder in the first degree; on a motion for a new trial it appears that the minute record did not

show that the defendant was present at all times during the trial. After the appeal was perfected the state asked leave to file a supplemental transcript consisting of corrected minutes of the lower court. The defendant opposed the request. This court said:

"There is no doubt that every court of record has the inherent right to cause its acts and proceedings to be set forth correctly in its records. (*Currey* v. *Butte Electric R. Co.,* 60 Mont. 146, 199 Pac. 243.) This is the rule in civil actions, and there appears to be no reason why it is not applicable in criminal ones. (*People* v. *Ward,* 141 Cal. 628, 75 Pac. 306; *Kaufman* v. *Shain,* 111 Cal. 16, 43 Pac. 393, 52 Am. St. Rep. 139; *In re Tucker,* 4 Okl. Cr. 221, 111 Pac. 665; [*Petition of*] *Breeding,* 75 Okl. 169, 182 Pac. 899; *Benedict* v. *People,* 23 Colo. 126, 46 Pac. 637; *Mulligan* v. *People,* 68 Colo. 17, 189 Pac. 5; *State* v. *Winter,* 24 Idaho 749, 135 Pac. 739; *State* v. *Gilbert,* 55 Or. 596, 112 Pac. 436; *Mitchell* v. *State,* 45 Fla. 76, 33 So. 1009; *State* v. *Hart,* 133 La. [5], 6, 62 So. 161.) Inasmuch as the court retains possession of its minutes and records it has the power to correct and amend the same, so as to make them conform to the truth whether an appeal is taken or not. (15 C. J. 977.) While, appeal being taken, the court loses jurisdiction of the case, it does not of its records, and where by reason of misprision of the clerk, or where through inadvertence or mistake some matter has been omitted from the record, the correction may be made. * * * The trial court having had the right to amend its minutes so as to state the truth, the precise question now presents itself as to whether the amended record may be filed in this court. *It would be a stronge commentary upon justice if this court should refuse to permit the truth to be shown * * *.* The state's motion for leave to file the amended transcript is granted. (*Pappot* v. *Howard,* 154 Ala. 306, 45 So. 581; *Breene* v. *Booth,* 3 Colo. App. 470, 33 Pac. 1007; *Judson* v. *Blanchard,* 3 Conn. 579; *Adams* v. *Higgins,* 23 Fla. 13, 1 So. 321; *Culbertson* v. *Salinger,* 111 Iowa 447, 82. N. W. 925; *Chambers* v. *Swango,* 59 S. W. 20, 22 Ky. Law. Rep. 923)."

468

We find the same rule in effect in other jurisdictions:

"The minutes of court may be corrected, at any time, to reflect the truth." (*State* v. *Johnson,* 171 La. 592, 131 So. 721.)

"Every court of record has general authority over its own records. The power of such a court to correct its records so as to make them speak the truth is inherent." (*Brown* v. *Sutton,* 158 Miss. 78, 121 So. 835, 837.)

In *Burnett* v. *Burnett,* 11 Cal. (2d) 259, 79 Pac. (2d) 89, 90, it was said:

"Admittedly a trial court upon its own motion or on ex parte application, has jurisdiction to correct mistakes in its orders and records which are not actually the result of the exercise of judgment. (*Lauchere* v. *Lambert,* 210 Cal. 274, 291 Pac. 412; *In re Estate of Willard,* 139 Cal. 501, 73 Pac. 240, 64 L. R. A. 554; *Carter* v. *J. W. Silver Trucking Co.,* 4 Cal. (2d) 198, 47 Pac. (2d) 733)."

The initial proceedings against Niewoehner are without precedent to sustain them and are void for this reason:

There was nothing pending in this court when Niewoehner presented his petition for filing, nor was there anything pending before us when he mailed his circular letter to the members of the bar of the state. By the improrer use of a *nunc pro tunc* order an attempt was made to have that situation remedied by having the records of the court show that Niewoehner's petition was pending at the time he sent out his circular letter. Here are the facts: Niewoehner presented his petition for filing October 7, 1944, he was denied the right to file it, and was later cited for contempt. The original attempt to bring Niewoehner before the court was abandoned and as stated by the majority H. C. Hall filed an affidavit October 19, 1944, which was the commencement of the proceedings against Niewoehner and on which he was tried and convicted. After all acts and things were done deemed necessary to the hearing, and time for the hearing was set, on November 15, 1944, a *nunc pro tunc* order was issued and filed directing the clerk to file the Niewoehner petition as of the original date it was presented by Niewoehner,

October 7, 1944, and thereupon after ordering it filed another order was issued denying the petition. Hence when the Hall affidavit was filed and the citation issued thereunder and served on Niewoehner there was nothing whatever pending before the court. Criticism of a court or a judge is contemptuous only when made while the cause to which it refers is pending before the court. (*In re Nelson,* 103 Mont. 43, 60 Pac. (2d) 365.)

The *nunc pro tunc* order directing the petition filed as of October 7th, when it was stamped on its face for filing under date of November 15, and entered on the records under the latter date was an improper and illegal employment of a *nunc pro tunc* order, and under the universally recognized rule was void and of no effect. This court defined a *nunc pro tunc* order in *State* v. *Francis,* 58 Mont. 659, 664, 194 Pac. 304, 305, and the circumstances wherein it may be used:

" '*Nunc pro tunc*' means literally, 'now for then,' and a valid *nunc pro tunc* order is one which, for some good reason, should have been made at an earlier date, and which therefore, the court may cause to take effect as of the date when it should have been made. The circumstances under which this may be done in this jurisdiction are concisely stated in *Power* v. *Lenoir,* 22 Mont. 169, 56 Pac. 106, as follows: 'The court may, in all proper cases, enter orders and judgments *nunc pro tunc.* * * * The cases in which the court will do this are of two classes: The first consists of those in which one of the parties dies after the verdict has been rendered, or the cause submitted for decision, and it is necessary to enter the judgment as of the date of the submission of the cause, to prevent injustice. * * * The second class is composed of those cases where an order or judgment has actually been made or rendered by the court, but, by reason of some misprision for which the parties are not entirely to blame, has never been entered.' '' There was nothing done or left undone on October 7, 1944, by the court, by the clerk of the court, or by any one else, at the time Niewoehner's petition was denied filing, that could be remedied by a *nunc pro tunc* order; failure to do any thing, to make any entry to perfect the court records

was not "overlooked by reason of inadvertence," or otherwise, and filing the *nunc pro tunc* on November 15, 1944, to have effect as of October 7, 1944, was ineffective for any purpose. Moreover, to such extent as the majority opinion may be based on the Niewoehner letter of October 9, 1944, the *nunc pro tunc* order of November 15, 1944, directing that the Niewoehner petition be filed as of October 7, 1944, antedating his letter, it is to be condemned as partaking of the same iniquities as ex post facto legislation fixing or increasing a penalty relating back for an act which was lawful at the time it was committed.

It was said in *Bailey* v. *Rennert*, 213 Ky. 262, 280 S. W. 1103, 1104: "The court was, therefore, without jurisdiction to enter the order made on June 23, 1925, unless it was entered *nunc pro tunc*. In order, however, for the court to enter such an order, there must be some record evidence authorizing it; i. e., some minute, memorandum, or other entry showing that the modified order was actually rendered on the former day, but by oversight was not entered on the record as rendered." (Citing cases.) The common use of such order is employed to enter on the court records a judgment or decree which by oversight was not entered when rendered. It was said in *Huggins* v. *Johnston*, Tex. Civ. App., 3 S. W. (2d) 937, 940: "The only purpose of a *nunc pro tunc* entry is to correctly evidence upon the records of the court a judgment, decree, or order actually made by the court, but for some reason not entered of record at the proper time."

In *Baylor* v. *Killinger*, 44 Ohio App. 523, 186 N. E. 512, 513, it was said: "* * * the *nunc pro tunc* feature of the entries involved was wholly valueless for any purpose under the facts alleged, and void. The function of a *nunc pro tunc* entry is not, by a fiction, to antedate the actual performance of an act which never occurred, but is to make the record conform to that which was actually done, at the time it was done."

In *Becher* v. *Deuser*, 169 Mo. 159, 69 S. W. 363, 364, it was said: "it is not admissible to make a *nunc pro tunc* entry based upon any amount of oral testimony, nor upon the memory of

the judge. Such entries can only be made upon 'evidence furnished by the papers and files in the cause, or something of record, or in the minute book or the judge's docket, as a basis to amend by.' "

In *Haray* v. *Haray,* 274 Mich. 568, 265 N. W. 466, 468, the supreme court of Michigan, quoting from a former case, said: "A *nunc pro tunc* entry * * * is an entry made now of something which was actually previously done, to have effect as of the former date. Its office is not to supply omitted action by the court, but to supply an omission in the record of action really had, but omitted through inadvertence or mistake * * *." There is no variation from this rule found in any of the multitude of decisions relative thereto. It necessarily follows that there was nothing pending before the court when the acts done by Niewoehner were done for which he was arraigned for contempt. In the case of *State ex rel. Metcalf* v. *District Court,* 52 Mont. 46, 55, 155 Pac. 278, 281, L. R. A. 1916F, 132, Ann. Cas. 1918A, 985, this court, quoting from a Kansas case (*In re Pryor,* 18 Kan. 72, 26 Am. Rep. 747) said: "No judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, *no matter how severe or unjust."*

In *Nixon* v. *State,* 207 Ind. 426, 193 N. E. 591, 594, 97 A. L. R. 894, it was said, "If the publication criticises the judge or court after the matter with which the criticism has to do has been finally adjudicated and the proceedings are ended so that the carrying out of the court's judgment cannot be thereby obstructed, the publication is not contempt and cannot be summarily punished by the court however false, malicious or unjust it may be. The remedy of the judge as an individual is by action or prosecution for libel."

If Niewoehner's petition or his circular letter contained false

or defamatory statements as to any justice he should proceed against him personally.

Mr. Justice Holloway, in speaking for the court in *State ex rel. Metcalf* v. *District Court,* supra, a contempt case, quoted with approval from Ruling Case Law as follows:

" 'The common-law rule was founded on the obsequious and flattering principle that a judge was the representative of the king, but the theory of government which invests royalty with an imaginary perfection, and which forbids question or discussion, is diametrically opposed to the principles of a free and popular government, in which the utmost latitude and liberty in the discussion of business affecting the public and the conduct of those who fill positions of public trust, that is consistent with truth and decency, is not only allowable, but is essential to the public welfare.' And the text is amply sustained by the authorities. (Citing cases.)

"The framers of our Constitution recognized, without limiting, the power of the courts to punish for contempt (section 3, Art. 8); but they understood the law of contempt to be a law of necessity, and its exercise in any given instance to be measured and restricted by the necessity which calls it into existence. The purpose to be subserved by investing our courts with such extraordinary power is to enable them to maintain order and decorum, compel respect for their lawful orders and process, and enable them to investigate and determine the causes before them without let or hindrance from any extraneous sources. * * *

"It is the nearest approach to autocratic power of any permitted under our form of government, and is not to be extended by implication. To confine its operations within the limits we have indicated will not impair the usefulness of the courts. Libel may still be prosecuted criminally or by civil action. 'Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence, and whilst they are found upon the judgment seat, so long, and no longer, will they retain the public confidence. If a judge be libeled by the public press, he and his assailant should be placed on equal grounds,

and their common arbiter should be a jury of the country; and if he has received an injury, ample remuneration will be made.' (*Stuart* v. *People,* 3 Scam. [395, 4 Ill.] 395).''

It would appear that the majority in dealing with Niewoehner must have reverted to the common-law rule and became obsessed with the notion that they were the ''king's own,'' robed in imaginary perfection, incapable of error instead of being the ordinary, fallible human beings that they are and servants of the people of Montana instead of their masters. The majority have certainly applied that ''autocratic power'' mentioned by Mr. Justice Holloway, in the case at bar. The power to cite and punish for contempt is the most dangerous power vested in any department or division of government. Mr. Edward M. Dangle, in his recent book on '' Contempt,'' has this to say in the preface of that work:

''The ever increasing number of contempt cases and the lack of clearly defined principles for the application of the power of contempt have created a state of confusion and uncertainty which has caused layman and lawyer alike to look upon this flexible, uncircumscribed legal power with fear and distrust. The power of judges to accuse, try, decide, and imprison for contempt committed in their presence has been constantly condemned as one of the greatest dangers to a free nation.

''It is a matter of common opinion among the uninformed public that many judges tend to regard their particular functions in contempt matters * * * as establishing the right to punish for contempt even to the extent of disregarding constitutional and other legal guarantees. The fact that the courts act as the accusers, the prosecutors, and the judges, creates a situation fraught with danger.

''The safety of our government is dependent to a great extent on the confidence and respect which the people have for the courts, and it is the duty of every court to strive by honorable means to merit and preserve that confidence and respect. A program to regulate the administration of the power of contempt should be fostered and encouraged by the judiciary and

members of the bar for the protection of the public and the courts. It is hoped that in some measure.this volume may serve as an antidote to the fear of oppression, and illustrate to the courts that the present manner of exercising contempt power may do more to degrade and impugn the dignity of the judiciary than the very conduct which constitutes the contempt.''

There can be called to enforce this court's orders, decrees and judgments, if the need should arise, all the powers vested in the executive department of the state government, with the control that department has over all the militant forces at its command. Hence, the individual situated such as Mr. Niewoehner is in this case has no recourse to any power within the state to protect him against the unjust condemnation rendered against him by the highest court in the state.

Supplemental Opinion.

(Filed December 26, 1944.)

PER CURIAM.

The people of the state of Montana have provided in their Constitution that a majority of the justices ''shall be necessary to form a quorum or pronounce a decision.'' (Article VIII, sec. 5.) On December 15, 1944, four of the five justices comprising this court concurred in the per curiam decision herein and, to furnish an opportunity for the remaining Justice to prepare his dissent thereto, ordered that the court's decision be not promulgated until December 19, 1944, on which date the decision was released.

On December 21, 1944, MR. JUSTICE MORRIS submitted to the court a dissenting opinion which goes far beyond the legitimate purposes of a dissent and far beyond the issues and the record in this contempt proceeding.

This proceeding was commenced by the presentation to the court of an affidavit charging respondent with contempt. The one issue was whether respondent's conduct there charged constitutes contempt.

The accusatory affidavit against Attorney Niewoehner herein

cannot properly be turned into an information or indictment against this court or against any of its members. It is the respondent's conduct that is the issue and not that of any other person.

*Tipton* v. *Sands,* 103 Mont. 1, 60 Pac. (2d) 662, 670, 106 A. L. R. 474, was a proceeding instituted under the Corrupt Practices Act to contest the election of Walter B. Sands as chief justice of this court. In his pre-election campaign Mr. Sands published and circulated advertising matter wherein he stated that $1500 paid to each justice as part of his annual salary under section 378, Revised Codes, enacted by the legislature in 1899, is unearned and unconstitutional under section 30 of Article VIII of the Constitution of Montana. The district court of Lewis and Clark county rendered its judgment in favor of the defendant Sands and an appeal was taken to this court. On the appeal all the justices of this court except Mr. Justice Morris disqualified themselves and declined to participate in the case and district judges were called to sit in their stead. The case was heard by Justice Morris and four district judges. The majority opinion held Chief Justice Sands' contentions without merit but that they were made in good faith, and therefore decided the contest in his favor. In his dissent in the case Mr. Justice Morris said:

"The majority opinion holds, in substance, that the contestee was guilty of violating the Corrupt Practices Act as charged, but affirms the trial court for the alleged reason that there is substantial evidence in the record to support the findings of the trial court that the violation of the act by the contestee was made in good faith. No other reasons are assigned for affirming the judgment. * * *

"The question inevitably arises, *Why did not the contestee,* being under the 'obligation due from all prudent men under such circumstances, *institute a proper court action to test* the constitutionality of the statute relating to the salaries of justices? He testified that he had believed the law invalid for several years, and the record shows he had had an extended

476

controversy with the secretary of state over the correct amount
of the filing fee when he became a candidate for Chief Justice
which the secretary called upon the Attorney General to solve,
and contestee was advised by the Attorney General that the legal
salary was $7,500. He undertook to force the secretary of state,
not by a legal action, but by much contention, to accept a filing
fee based upon a $6,000 salary. As a lawyer he must have known
the secretary could not accept a fee fixed on any other salary
than the amount recognized as legal and drawn by every justice
for the last 30 years; yet in the face of such presumed knowledge
contestee continued to agitate the matter, and paid the extra $15
of the fee under protest. The resulting advertising arising from
the newspaper notoriety following was no doubt considered good
for a candidate just launching a campaign. It is quite obvious
that contestee believed this salary question was his prize cam-
paign issue, as it was given first place on all the four lots of
campaign cards gotten out and circulated by him. He testified
he discussed the issues over the radio and on the stump. *So by
this line of evidence we arrive at the obvious answer of why
contestee did not test the matter in court instead of using it as
his prize issue.* A special proceeding could have been brought
on an agreed statement of facts directly in the Supreme Court,
and being an action that was entitled to preference, argued and
decided long before the general election. But by that course the
candidate would have been deprived of his prize campaign issue,
and many a vote would, in all probability, be lost. *The purpose
is revealed* and the plea of good faith is thus stripped of its garb
in which it had been decked out for public consumption as an
issue of economy, *and in its nakedness we behold a glaring
political trick, spread abroad over the state impugning the in-
tegrity of every individual who had occupied a place on the
Supreme Bench of the state in the last 30 years. 'Good faith'
demanded that contestee submit the question to the regularly
constituted tribunals of the state for adjudication before charging
that all other members of the court were filching thousands of
dollars from the state treasury illegally.* It must be remembered

that he did not say that, in his opinion, the law was unconstitutional, but made the bold, unqualified statement that $1,500 was 'unearned and unconstitutional.' From the statement on all his cards he might just as well have said, 'all Justices for the last thirty years have stolen $1,500 each, each year for thirty years out of the state treasury.' He made the positive statement with such assurance as to carry the notion that the question was determined and fully settled. *He assumed to announce a conclusion with all the positiveness of a deliberate court decision* and for the avowed purpose of securing votes, and then, when haled into court to answer his false statements, comes here on a plea of good faith! * * * to contend that the contestee in this case should be excused for a plain and palpable violation of the law because he believed it invalid is to cheapen and degrade the court of which the contestee is a member, and to make a plea of ignorance a shield for corruption." (Emphasis ours.)

The dissent argues that two of the Justices "were disqualified under section 8868, Revised Codes" by reason of their interest in the question of whether their receipt of compensation as referees violated section 30 of Article VIII of the Constitution. This is the same constitutional provision which in *Tipton* v. *Sands,* supra, the defendant Sands had accused "all Justices for the last thirty years" including Justice Morris, of violating and which provision was regarded by Justice Morris as the chief issue in that case, yet he did not there consider himself disqualified nor did he deem that section 8868, Revised Codes, had any application whatever. Here however he considers two Justices disqualified because the attempt has been made to inject those issues which are obviously extraneous and cannot be determined.

Before this contempt proceeding came on for hearing, Mr. Justice Morris stated in writing that the facts which the respondent Niewoehner set forth in his motion to correct the minutes "are true and are a complete defense against any proceeding in contempt." Notwithstanding such positive unqualified commitment the dissenting opinion recites that, "The sup-

478

position that by reason of my dissent to the issuance of the citation I was disqualified is untenable.''

The dissenting opinion contains various inaccuracies and adverts to numerous matters which nowhere appear in the record and which have no bearing on the issues of this contempt proceeding. Any attempt to discuss them would unduly extend this opinion and serve no judicial purpose.

Respondent has indicated his intention to seek a review of this decision by the United States Supreme Court. Will he there present his petition to the Clerk of that court at nine o'clock some Saturday morning; demand that he be heard in oral argument thereon; fix ten o'clock the same day for hearing; demand that the marshal have the justices on the bench at that time; and, in the event he is not then permitted to orally argue his cause, will he, on the following Monday, mail to every lawyer admitted to practice before the United States Supreme Court a letter complaining of his treatment? To ask this question should be to answer it. Such conduct cannot be tolerated. It is contempt.